JOHN E. WILSON et al. Appellees, vs. ROY HEY et al. Appellants.

*Opinion filed February 20, 1908.*

1. LABOR UNIONS—*unions may accomplish their purposes by lawful means only.* Laborers may organize to promote their welfare and may refuse to work for a particular employer or may obtain employment for the members of the union by solicitation and promises of support in trade or otherwise, but in accomplishing their purposes they must proceed by lawful and peaceable means.

2. BOYCOTTS—*members of union cannot compel others to cease trading with person.* Members of a labor union may cease patronizing a person when they regard it to their interests to do so, but they have no right to compel others to break off business relations with him by unlawful means and with the motive of injuring him.

3. SAME—*when direct threats are not necessary to make action unlawful.* The giving of notices by labor unions that a certain person is on the "unfair list," if such notices excite the fear and reasonable apprehension of the recipients that their own business will be injured unless they break off business relations with or cease patronizing such person, is unlawful, even though no actual threats are made.

4. SAME—*when putting person on "unfair list" is, in effect, establishing a boycott.* The giving of notices that a certain person is on the "unfair list" is, in effect, establishing a boycott, where the understood object of such course is that if those receiving the notices keep up their business dealings with such person the labor unions will withdraw their patronage from them also.

5. SAME—*breaking of contracts is not essential to make action unlawful.* If the action taken by a labor union to coerce a certain person into complying with its demands results in injury to his business by the withdrawal of trade and patronage from outsiders which would have continued indefinitely but for the interference of the union the action is unlawful, even though it does not result in the breach of any existing contract. (*Doremus v. Hennessy,* 176 Ill. 608, explained.)

6. SAME—*when injunction restraining placing of complainant's name on "unfair list" is not too broad.* An injunction restraining defendants from placing complainant's name on the "unfair list" is not too broad, where the evidence shows that such action was not intended merely as a means of notifying the members of the labor union of the fact so that they might withdraw their patronage, but that its purpose and effect was to establish a boycott.

SCOTT and FARMER, JJ., dissenting.

Appeal from the Appellate Court for the Fourth District;—heard in that court on appeal from the Circuit Court of Randolph county; the Hon. Charles T. Moore, Judge, presiding.

O. A. Harker, and A. E. Crisler, for appellants:

Conspiracy is an agreement or combination by two or more persons to do an unlawful act or a lawful act by unlawful means. Bouvier's Law Dict.; *Smith* v. *People,* 25 Ill. 11; *Heaps* v. *Dunham,* 95 id. 583; *Breitenberger* v. *Schmidt,* 38 Ill. App. 168.

Such agreements or combinations are not unlawful, so as to constitute them conspiracies, unless they are for acts, whether as ends or means, which would be unlawful apart from the agreement. *Rodgers* v. *Duff,* 13 Moore's P. C. 209; *Rowen* v. *Matheson,* 14 Allen, 499; *Cote* v. *Murphy,* 159 Pa. 420.

It is not unlawful for a labor union to induce those engaged in the same occupation to become members of the organization, and, as a means to that end, prohibit its members from working where non-union men are employed, provided such prohibition is not attended with any violence or threats. *Commonwealth* v. *Hunt,* 4 Metc. 111; *Moores* v. *Bricklayers' Union,* 10 Ohio, 665; *Beaton* v. *Tarrant,* 102 Ill. App. 124.

One man may lawfully refuse to deal with another, and this right, which one man may exercise singly, many may agree to exercise jointly and make simultaneous declaration in that regard by voluntary association. *Bohn Manf. Co.* v. *Hollis,* 54 Minn. 223; *Macauley* v. *Tierney,* 19 R. I. 225; *Printing Co.* v. *Howell,* 26 Ore. 527; *Protective Ass.* v. *Cumming,* 170 N. Y. 315.

Not only did the team drivers' union and the Trades and Labor Assembly have the right to place appellees on the "unfair list," to the end that all union men might cease to patronize them, but they had the right to notify others of

their action and advise them not to patronize appellees. They had the right to do that even by printed circulars. *Ulery* v. *Stock Exchange*, 54 Ill. App. 233.

So long as the members of a union employ no other means to deter persons from dealing with an employer or one antagonistic to the union except persuasion and the withdrawal of patronage there is nothing illegal in their action.   18 Am. & Eng. Ency. of Law, (2d ed.) 87.

A court of equity will not interfere, by injunction, to restrain the acts of a labor union on the ground that they are injurious to an individual's business unless it appears that the acts done or threatened are unlawful and constitute a civil injury.   *Mayer* v. *Stonecutters' Ass.* 47 N. J. Eq. 519; *Macauley* v. *Tierney*, 19 R. I. 225; *Bohn Manf. Co.* v. *Hollis*, 54 Minn. 223.

H. CLAY HORNER, for appellees:

The common law seeks to protect every person against the wrongful acts of others, whether committed alone or by combination, and an action may be had for injuries done which cause another loss in the enjoyment of any right or privilege or property.   *Doremus* v. *Hennessy*, 176 Ill. 614.

The contracts which appellees were morally intimidated into signing, to employ none but union men, are against public policy and void.   *Christensen* v. *People*, 114 Ill. App. 70; *Berry* v. *Donovan*, 74 N. E. Rep. 602; Chitty on Contracts, 578.

"Unfair" and "unfair-listing" is the technical language of all unionism in establishing a boycott.   *Lowe* v. *State Federation*, 139 Fed. Rep. 80.

The right to contract freely is property; also the laboring man's labor is property.   (*Mathews* v. *People*, 202 Ill. 389.)   Hence these contracts so forced on appellees take appellees' property (right to contract freely) and also the non-union man's property (labor), and all without "due process of law."   Moreover, the very object of the boycott

being to compel appellees first to sign and then stand by these contracts, it is criminal under sections 158 and 159 of the Criminal Code of Illinois.  *Christensen* v. *People,* 114 Ill. App. 70.

Boycotts, though unaccompanied by violence or intimidation, are unlawful.  *Gray* v. *T. C.* 63 L. R. A. 757; *Thomas* v. *Railway Co.* 62 Fed. Rep. 803.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The appellees, John E. Wilson and John T. Wilson, are partners, and have been engaged in business many years in Sparta, a city of Randolph county, having a population of 3000 at the last census.  Their business has been that of liverymen, hackmen and draymen, and they have owned and used a large number of teams, wagons and vehicles furnished to the public for hire.  Their business included hauling freight for merchants and others, and carrying passengers, boarding horses for customers, furnishing storage for a hearse and a team for hauling the hearse.  They also owned a building known as the "Auditorium," which they rented for lectures and exhibitions.  There have also been in Sparta organizations or unions of laborers, among which are the Team Drivers' International Union No. 109, the Brotherhood of Carpenters and Joiners of America No. 479, the Brotherhood of Painters, Decorators and Paper Hangers of America No. 74, and the United Mine Workers of America No. 659.  These are subordinate unions to the Sparta local union of the American Federation of Labor, which is a general organization combining all trades and callings, and there is another organization known as the Sparta Central Trades and Labor Assembly, composed of delegates from each of the subordinate unions.  At various times since 1900 there have been difficulties between the appellees and the labor unions, and the team drivers' union has demanded of the appellees the employment of none but

union team drivers on their teams or on any hack or omnibus. One of these difficulties was in 1903, about hauling brick to the school house. It was a short haul, and the appellees used two teams for three wagons, so as to leave one wagon standing for loading or unloading. A committee of the union called upon one of appellees and informed him that he was preventing men from working and ordered him to put a team and driver on each wagon. He pleaded economy and that there was no necessity for a team on each wagon, but after a hearing the Trades and Labor Assembly ordered a team for each wagon, which was put on until appellees could hear from an appeal taken to the International Brotherhood of Teamsters. They received a communication from Cornelius P. Shea, the president, declining to interfere, and they complied with the order. In 1901 the team drivers' union published a notice in a newspaper requesting all union men not to patronize appellees until they should comply with some agreement with them, but all the difficulties were settled by appellees yielding to the demands made. In the spring of 1904 there was trouble over the building of a church in Sparta, when appellees were notified to take their teams off. On April 14, 1904, the appellees and officers of the team drivers' union signed a contract, in which the appellees agreed "to work only union team drivers on all teams; also to employ Federation members at all other work as helpers." The contract contained this further agreement on the part of appellees: "In case no union man can be had from either union we can employ another only for a short time, and if he or they work for more than one day we agree to retain one dollar on his or their application to join the A. F. of L. No. 7231, or the Team Drivers' Union No. 109." In November, 1904, there was a new difficulty between the parties growing out of that contract. The dispute was over the claim that appellees had not retained the proper amount of money from non-union employees. Appellees claimed that there was only one dollar

due on a man named Dude Wilson, and that was paid, but
the union claimed that appellees owed five dollars on account
of non-union men.   Appellees refused to pay the four dol-
lars, and the team drivers' union put them on what was
called the "unfair list" and reported such action to the local
union of the Federation of Labor and the Trades and Labor
Assembly.   The Trades and Labor Assembly endeavored
to have appellees yield, and upon their refusal the assembly
appointed a committee of three to inform the business men
generally, in Sparta, a part of whom had been in the habit
of having appellees haul their freight and who were accus-
tomed to deal with them, that appellees were on the "unfair
list."   The members of the various unions ceased to patron-
ize appellees, and some of those to whom notices were given
did the same.   There were some who paid no attention to
the notice but continued to employ and deal with appellees
as before.   A bill of paint sold by one man, which was
delivered by appellees, was sent back for that reason and he
was compelled to take it back.   There was no threat made
by the committee in connection with the notice, but it was
understood by various parties who received it that their
business would be injured and trade withdrawn unless they
complied with it.   A series of lectures were to be given
under the auspices of the school board and the Auditorium
was engaged for that purpose.   An officer of the school
board was notified not to hire the Auditorium, by a com-
mittee, who stated that they were acting as a committee of
one of the unions.   The Trades and Labor Assembly on
January 26, 1905, notified the Lyceum Bureau that the
Auditorium, in which the lectures were to be given, was
on the "we don't patronize" list, and the board was re-
quested to arrange to have the lectures delivered elsewhere.
The union afterward granted the request of the school board
and removed the ban.   A committee called on the under-
taker who owned the hearse and notified him not to use
appellees' team to haul his hearse at a funeral, and the no-

tice was complied with. A similar notice was given in another case.

Appellees filed their bill in this case in the circuit court of Randolph county setting up these facts, and making the appellants, who are the unions and their officers, defendants, and praying for an injunction against interfering with the appellees, their servants or employees, from boycotting the appellees, their teams or vehicles or business, and from giving notices with the intent or calculated to deter the public from doing business with them. Later a supplemental bill was filed alleging acts of interference with the business of appellants after the filing of the original bill. Answers were filed denying the material allegations of the bill and supplemental bill, and there was a hearing in open court, at which a large number of witnesses were examined and documentary evidence was introduced. A decree was entered finding the allegations of the bill and supplemental bill to be true, granting an injunction substantially as prayed for in the bill against putting appellees or their employees on the "unfair list" and from boycotting appellees, or going to or sending committees to their customers to induce or compel them to withhold their trade from appellees, and from menacing or interfering with their business in furtherance of the conspiracy against them.

The facts are not in dispute, and the argument for appellants is based on the proposition that nothing wrong or unlawful was done. The jurisdiction of equity is not questioned if there was a wrongful interference with the rights of appellees, but counsel say that it was neither unlawful to refuse to deal with appellees nor to notify others of such refusal, and to try to induce them, by peaceable means, not to patronize appellees.

The rights of labor unions and the extent to which they may lawfully go have been pretty fully explained in *O'Brien* v. *People*, 216 Ill. 354, and *Franklin Union* v. *People*, 220 id. 355. The right of laboring people to organize for the

purpose of promoting their common welfare by lawful
means is fully recognized. They may refuse to work for
any particular employer, and may obtain employment for
their members by solicitation and promises of support in
trade and otherwise, but in the accomplishment of their
purpose they must proceed only by lawful and peaceable
means and they have no right to make war on other persons.
It is not wrong for members of a union to cease patroniz-
ing any one when they regard it for their interest to do so,
but they have no right to compel others to break off business
relations with the one from whom they have withdrawn
their patronage, and to do this by unlawful means, with
the motive of injuring such person. Such means as giving
notices which excite the fear or reasonable apprehension of
other persons that their business will be injured unless they
do break off such relations or cease patronizing another are
wrong and unlawful. If the notices given or things done
have the natural effect of exciting such reasonable fear and
apprehension and accomplish the result intended, it is im-
material that they are not accompanied by direct threats.
In this case a witness who said he did not pay any attention
to the notice and did not cease to deal with appellees testified
that the effect on his business was bad, and others testified
that they notified appellees that they did not want them to
haul their freight because of fear of being boycotted if they
permitted them to continue doing the hauling. There was
no threat made in connection with the notice, but it was
understood by the parties that the result would be an injury
to anyone who dealt with the appellees. It was understood
by those who received the notices that if they continued to
trade with appellees and did not break off existing business
relations they would incur the hostility of the unions and
their own business would suffer. The evidence shows that
in this case, at least, the words "unfair list" were a euphe-
mism for a boycott, and, of course, it does not change the
nature of an unlawful thing by substituting an inoffensive

for an offensive name. The testimony was that the object of putting one on the "unfair list" was, if the parties receiving a notice should keep on dealing with such person the unions would withdraw their patronage, and the only object of the whole proceeding was to coerce appellees by injuring their business with the public at large.

In the case of *Doremus* v. *Hennessy,* 176 Ill. 608, there was an agreement of the appellants to injure and destroy the business of the appellee, and she recovered the damages resulting from their acts in the execution of that purpose. The court there laid down the fundamental principles governing such cases, and held that every man has a right, under the law, as between himself and others, to full freedom in disposing of his own labor or capital according to his own will; that one who invades that right without lawful cause or justification commits a legal wrong, and the damage inflicted by the use of intimidation, obstruction or molestation with malice is without excuse, and actionable. Competition was involved in that case, but it was held not to be lawful competition to interfere in the business of another with a direct purpose of injuring him. Counsel seek to distinguish that case from this one for the reason that existing contracts were broken; but that was not the whole of the appellee's case nor the only ground upon which she was permitted to recover. It was regarded as equally wrongful to pursue the appellee and interfere with her and those to whom she applied to do her work. In the petition for rehearing the case was distinguished from *Allen* v. *Flood,* 67 L. J. Q. B. 119, on the ground that there were contracts, but the court did not express any approval of the doctrines of that case nor change or modify anything in the opinion. In the later case of *London Guarantee Co.* v. *Horn,* 206 Ill. 493, it was held that procuring the discharge of Horn from an employment which was terminable at will, where the motive was to injure him and to secure a benefit to the guarantee company, gave rise to a cause of action.

In that case the act consisted of a threat to exercise an unquestionable legal contract right, and there was no contract which was violated by the employer in discharging Horn. There is no conceivable ground of distinction between the employment of a laborer for no definite time but where the employment will continue so long as agreeable to both parties, and the employment of appellees by merchants in hauling freight from the railroad station from day to day and in delivering goods sold to their customers, where the relation would continue indefinitely but for the interference of appellants. Neither is there any substantial difference between interfering with the employment of a laborer and depriving him of his earnings, and interference with regular customers of a merchant from whose custom and business he gains a livelihood. The laborer, if not employed for a definite time, may terminate the existing relation at any time, and a customer may likewise cease to deal with the merchant for any reason or without a reason, but if one has a right to protection from interference the other certainly has an equal right. Here was a small place in which there were a number of unions, embracing a considerable part of the population, and the ruinous effect of a boycott and a withdrawal of their patronage from customers of appellees unless such customers should break off all business relations with appellees can readily be seen and understood.

It is urged that the injunction as allowed is too broad, for the reason that appellants are enjoined from putting appellees on the "unfair list." If the only purpose of putting one on the "unfair list," and the only effect, were to notify members of the union of the fact so that they might withdraw their patronage, the injunction would be too broad; but the evidence in the record is that the purpose of that list is not so limited and that its purpose and effect is to establish a boycott, and in that view it is not too broad.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*

SCOTT and FARMER, JJ., dissenting:

We do not think the evidence in this case warrants the conclusion that appellants established or sought to establish a boycott. The committee appointed by the Trades and Labor Assembly called on many persons in Sparta who had been in the habit of dealing with appellees and informed them of the action that had been taken by the unions. Following this, members of the various unions in the city ceased to patronize appellees, and some of those to whom notice was given, as above mentioned, did likewise, while others to whom notice of the action of the unions came, paid no attention to the matter but continued to deal with appellees as before. No violence or threats of violence were used by appellants, or either of them, to induce appellees to adjust the controversy in a manner satisfactory to the unions or to cause individuals to whom the notices were given to refrain from dealing with appellees, and appellants did not cease, or threaten to cease, to patronize those business men who paid no attention to and who were not influenced by the notice that appellees were upon the "unfair list." It is true that one business man who continued to deal with appellees after receiving the notice, testified that his business was not as good as it had been before he received the notice. The record is barren of evidence as to whether or not the lessening of his profits resulted from the continuance of his business relations with appellees.

The law is that an individual may refrain from trading or dealing with any particular person, and that two or more individuals may agree among themselves that they will not trade or deal with a certain person, and may give notice to others that they have made such an agreement. (*Commonwealth* v. *Hunt,* 4 Metc. 111; *Bowen* v. *Matheson,* 14 Allen, 499; *Macauley* v. *Tierney,* 19 R. I. 225; *Bohn Manf. Co.* v. *Hollis,* 54 Minn. 223; *Cote* v. *Murphy,* 159 Pa. 420; *Longshore Printing Co.* v. *Howell,* 26 Ore. 527; *National Protective Ass.* v. *Cumming,* 170 N. Y. 315; 18 Am. &

Eng. Ency. of Law,—2d ed.—p. 87.) Appellants did nothing more.

While this question has not heretofore arisen in this court, it was considered in the Appellate Court for the First District of this State in the case of *Ulery* v. *Chicago Live Stock Exchange,* 54 Ill. App. 233, where the court used language as follows: "A person, with or without reason, may refuse to trade with another; so may ten or fifty persons refuse. An individual may advise his neighbor or friend not to trade with another neighbor. * * * It is not an unlawful interference with the trade of another to advise people to deal with his competitor or to decline to do business with him."

Appellees insist that the case of *Doremus* v. *Hennessy,* 176 Ill. 608, is in point and that it sustains the decree. It is to be observed that in that case the members of the laundrymen's association induced the customers of another to violate existing contracts which they had with such other and to stop dealing with her. According to the opinion in that case the illegality of the transaction on the part of the association consisted in the fact that it induced third parties to break their contracts with the person against whom the efforts of the association were directed. There is no evidence in this record that appellants, or either of them, sought to induce any person to violate any contract or contractual relation with the appellees. The only action of appellants that could be regarded as an attempt to interfere with existing contractual rights arose in reference to the auditorium controlled by appellees. The president and secretary of the labor assembly notified a lecture bureau located at Kansas City, Missouri, which had contracted to furnish a course of lectures to be given in the auditorium under the auspices of the Sparta high school, that the auditorium was on the "we don't patronize" list. This notice was given by letter, and in the letter it was suggested that the bureau should use its influence with the school board to have the lectures held in

some other building, so that union men and women who felt an interest in the lectures would attend them. Prof. L. J. Sexton was in charge of the high school and had arranged for the course of lectures. He went before the labor assembly and asked that an exception be made as to these lectures, as he had already contracted for the use of the building with a view to having the lectures delivered therein. His request was complied with, the labor assembly so notified the bureau, and the auditorium was used for the lecture course. As this matter was adjusted prior to the filing of the bill, it is manifest that it afforded no basis for invoking the aid of a court of equity. It appears from the testimony of Eiker, the owner of the hearse mentioned in the bill, that there was no yearly contract between himself and appellees, as is averred by the bill, and that while on one occasion after he was advised that appellees had been placed on the "unfair list" he used on the hearse a team not owned by appellees, he had since that occasion used appellees' teams and that no one had undertaken to interfere with him in so doing.

One of appellees had until recently been a member of the teamsters' union. Both are still members of the Merchants' League of Sparta, an organization which in its aims and purposes does not seem dissimilar to the ordinary union. Appellees were entirely willing to use the methods of such organizations so long as they profited thereby, but were not willing to abide regulations of the character of those to which they themselves had given assent, when by so doing it seemed to them that their profits would be slightly decreased.

In our judgment equity should not interfere in this controversy.