JOHN J. CAMPBELL v. MOTION PICTURE MACHINE
OPERATORS' UNION OF MINNEAPOLIS,
LOCAL 219, AND OTHERS.[1]

January 27, 1922.

No. 22,200.

**Private person may enjoin violation of anti-trust act.**

1. A private party may maintain a suit for injunction to restrain a violation of section 8973, G. S. 1913, if necessary to prevent irreparable injury to property for which there is no adequate remedy at law.

**Even when the invasion of his right constitutes a crime.**

2. The fact that a threatened invasion of a person's rights may constitute a criminal offense is no bar to relief by an injunction to which such person would otherwise be entitled.

**Conducting a motion picture theatre within the boycotting act.**

3. The business of conducting a motion picture theatre falls within the purview of section 8973, G. S. 1913, and a combination to boycott such a theatre is one in restraint of trade and forbidden by the terms of the statute.

**Meaning of word "trade" in anti-trust law.**

4. The word "trade" is used in the statute in its broad sense and is not restricted to trade involving useful commodities.

[1]Reported in 186 N. W. 781.

**Constitution—freedom of speech not violated by injunction granted.**

   5. The publication of the statement that plaintiff was unfair to organized labor or portended injury to plaintiff's business under the facts found, and the judgment enjoining the continued publication of the statement was not too broad and did not deprive defendants of the freedom of speech guaranteed by the Constitution.

Action in the district court for Hennepin county to recover $1,100 and to restrain Motion Picture Machine Operators Union of Minneapolis, Local 219, International Alliance of Theatrical Stage Employes of the United States and Canada, a trade union, also Trades and Labor Assembly of Minneapolis and Hennepin county, and others, from conspiring to restrain the patronage and trade of plaintiff's Wonderland Theater by picketing or otherwise or publishing that plaintiff theatre was unfair to organized labor and should not be patronized. The case was tried before Bardwell, J., who made findings and ordered judgment in favor of plaintiff. From the judgment and decree, defendants appealed. Affirmed.

*George B. Leonard, Thomas E. Latimer, Robert M. Works* and *Fred Berglund,* for appellants.

The granting of an injunction to restrain the publication of the fact that defendant is "unfair" and that he was placed on the "We do not patronize list," is in violation of the constitutional guarantee of free speech and free press under section 3, art. 1, of the state Constitution. These particular guarantees are the necessary props of constitutional government itself and the abridgment of these rights tends to undermine the foundations upon which such government rests to a greater degree than the violation of any other right similarly guaranteed by the Constitution. Forms of property may change, the administrative, legislative and judicial departments of the government and their respective powers may alter, but before such changes can inure to the benefit of all the people for whom government is established and maintained, the expression of the will of the people by means of free speech and a free press must remain inviolate and unrestrained. The only remedy which a person ag-

grieved by a publication is entitled to is by an action at law for damages, and the government to a criminal prosecution. This is the import of the words, "being responsible for the abuse of such right." Certainly a person cannot be responsible for the abuse of such right in advance of such publication. There is nothing in the constitutional provision from which the power to restrain the abuse of such right can be spelled out. Cooley, Const. Lim. (7th ed.) 603, 612, 614; State v. Pioneer Press Co. 100 Minn. 173, 110 N. W. 867, 9 L. R. A. (N. S.) 480, 117 Am. St. 684, 10 Ann. Cas. 351.

So carefully have been the rights of the people of this state guarded against encroachments upon their liberty of speech and press, that even in construing criminal acts, for the punishment of the abuse of these rights, the powers of the legislature have been limited' to publications which are blasphemous, obscene, seditious or scandalous in character, or "tend to excite the public mind," and thereby become a public offense, and such as by the falsehoods and malice, injuriously affect the standing, reputation or pecuniary interests of individuals. State v. Pioneer Press Co. 100 Minn. 173, 110 N. W. 867, 9 L. R. A. (N. S.) 480, 117 Am. St. 684, 10 Ann. Cas. 351.

And so no injunctive relief will be granted to restrain the publication of a mere libel where there is no breach of a trust or contract, for the reason that such injunction would restrain the freedom of press guaranteed by the Constitution. Howell v. Bee Pub. Co. 100 Neb. 39, 159 N. W. 358, L. R. A. 1917A, 160, Ann. Cas. 1917D, 655; Francis v. Flinn, 118 U. S. 385, 6 Sup. Ct. 1148, 30 L. ed. 165; State ex rel. Liversey v. Judge of Civil District Court, 34 La. Ann. 741, 745; Raymond v. Russell, 143 Mass. 295, 9 N. E. 544, 58 Am. Rep. 137; Finnish T. S. v. Raivaaja Pub. Co. 219 Mass. 28, 106 N. E. 561, Ann. Cas. 1916D, 1087; Manger v. Dick, 55 How. Pr. (N. Y.) 132; Marlin Firearms Co. v. Shields, 171 N. Y. 384, 64 N. E. 163, 59 L. R. A. 310; Butterick Pub. Co. v. Typographical Union No. 6, 50 Misc. 1, 100 N. Y. Supp. 292.

While there is a difference of opinion upon the question as to whether the power of the courts to grant injunctions against publications in furtherance of a boycott is restricted by constitutional

guarantees for freedom of speech and of press, many courts have held that the complainant is relegated to his remedy at law, and is not entitled to an injunction. Lindsay & Co. v. Montana Federation of Labor, 37 Mont. 264, 96 Pac. 127, 18 L. R. S. (N. S.) 707, 127 Am. St. 722; Marx & H. Jeans Clothing Co. v. Watson, 168 Mo. 133, 67 S. W. 391, 56 L. R. A. 951, 90 Am. St. 440; In re Heffron, 179 Mo. App. 639, 162 S. W. 652; Empire Theatre Co. v. Cloke, 53 Mont. 183, 163 Pac. 107, L. R. A. 1917E, 383. Truax v. Bisbee Local No. 380, 19 Ariz. 379, 171 Pac. 121, 126; Richter Bros. v. Journeymen Tailors Union, 24 Ohio Law J. 189.

*Nathan H. Chase,* for respondent.

LEES, C.

Plaintiff, who owns and operates a motion picture theatre in the city of Minneapolis, brought this action to enjoin the defendants from continuing in a course of conduct which interfered with his business. The trial resulted in findings in his favor. Judgment was entered thereon and defendants appealed.

The findings are lengthy, but we set them out practically in full in order that there may be a better understanding of the questions presented by the appeal.

The Motion Picture Operators Union of Minneapolis, Local 219, is an unincorporated association having a large membership composed of operators, by trade, of motion picture projecting machines. None of its officers or members is sole or part owner, or manager or proprietor of any theatre or place of amusement.

The Trades & Labor Assembly is an unincorporated association composed of delegates from the local trade and labor unions in the city of Minneapolis, including Local 219. The assembly edited and published a weekly newspaper called "The Minneapolis Labor Review." It was and is the official organ of the Assembly.

Until February 24, 1917, plaintiff employed none but members of Local 219 to operate the projecting machines in his theatre. On February 10, 1917, having decided to reduce his expenses, he gave to his operators the notice called for by his contract with them for termination of employment, and gave similar notice to the Local.

He informed them that, to reduce expenses, he was going to operate his machine himself for the whole or a greater portion of the time, but was willing to employ a member of the local, at the wage scale fixed by it, to relieve him a portion of the time each day. The officers of the local refused to enter into the proposed arrangement. Plaintiff then offered to join the local, but was not taken in because the rules did not allow an owner or proprietor of a theatre to become a member. On February 24, 1917, the employment of plaintiff's machine operators was terminated in accordance with the notice, and from and after that date and until June 18, 1917, plaintiff operated his machines himself, with part time aid from one Dillon, who was not a member of Local 219.

Subsequent to February 10, 1917, the officers and certain members of Local 219 and the grievance committee of the assembly requested plaintiff to continue the local operators in his employ, but plaintiff refused so to do except upon the terms heretofore stated. Thereupon such officers and members entered into a combination to restrain and injure the trade and business of plaintiff's theatre by causing decrease and loss of patronage thereof, to the end and with the sole intent and purpose of forcing him to accede to such request. Pursuant to such combination, they secured the adoption, at one of the regular meetings of the assembly, of a resolution declaring plaintiff and his theatre to be unfair to organized labor.

The constitution of the assembly provides, among other things, as follows: That the assembly shall maintain a list of names of individuals who are known to be unfair to organized labor, called the "We Do Not Patronize List." This list is absolutely under the control of the assembly, which has power to place names thereon or remove them therefrom.

The editor-manager of The Labor Review is elected by the assembly and is required to edit the paper in conformity with the principles of the Trades & Labor Assembly.

Following the adoption of the "unfair" resolution, and pursuant to and in furtherance of the combination above mentioned, the assembly caused to be published from time to time in The Labor Review articles in which it was stated, among other things, that

plaintiff's theatre was unfair to organized labor, that the union had the right to withhold patronage from the theatre, and that organized labor and the public thoroughly understood the issue and were giving the Operators' Union loyal support. The paper has a general and extensive circulation among the members of the various labor and trade unions represented in and by the assembly.

In furtherance of such combination and to further injure plaintiff's business, the officers and members of the Local, shortly subsequent to February 24, 1917, employed a "picket" to walk back and forth on the street directly in front of plaintiff's theatre, displaying a banner upon which were printed in large letters the words: "This Theatre Unfair to Organized Labor." The picket commenced displaying the banner each morning at the time plaintiff opened his theatre for business and continued the picketing and display until the close of the theatre each evening, with the exception of two weeks, up to and including the time of the trial of this action on September 23, 1919.

Immediately following the institution of the picketing and bannering, and as the direct result thereof, crowds collected from time to time on the sidewalk in front of the theatre and engaged in loud and boisterous talk relative to the trouble between plaintiff and organized labor, with the result that the police were frequently called to clear such crowds away and quell the disturbance thus created. At intervals pickets talked to people passing by and endeavored to attract attention and to get passers-by to talk to them. On one occasion at least the picket then on duty swore at the people passing in front of the theatre and called them vile names. While the disturbances were more frequent during the first six months of the picketing and bannering, there were sporadic instances of this character, necessitating calling the police, down to the time of the trial.

After the institution of the picketing and bannering, a number of people came up to the ticket office, put down their money and then, on noticing the picket and banner, withdrew their money and walked away. Others walked toward the ticket office, and then, their attention being called or directed to the picket and banner, similarly

walked away. As the direct result of the picketing and bannering and of the articles published in The Labor Review, large numbers of people have been influenced to withdraw and withhold their patronage of plaintiff's theatre, and he has been and is annoyed and obstructed in its conduct and operation and has suffered and is suffering irreparable injury for which there is no adequate remedy at law.

The term "unfair," as contained and used in the resolution adopted by the assembly and set forth on the banner, meant and signified to all members of labor unions and to the public generally, and was, by the officers and members of Local 219 and the officers and delegates of the assembly, intended to signify that patronage of plaintiff's theatre was to be withheld because of action taken with reference thereto by some labor or trade union, and was not to be bestowed until rescission of such action was evidenced by the withdrawal of the picket and banner.

In substance the conclusions of law were that plaintiff was entitled to an injunction restraining defendants from combining or continuing a combination to interfere with the patronage of his theatre by picketing or bannering it or by publishing statements in The Labor Review that plaintiff was unfair to organized labor, or by publishing in any other manner statements naturally tending to injure or restrain his business. The record presents two principal questions, the first, whether section 8973, G. S. 1913, commonly known as the Anti-Trust Statute, applies to this case, and the second, whether defendants' acts amounted to an unlawful boycott of plaintiff's theatre. Our conclusion respecting the first question renders consideratin of the second unnecessary.

Section 8973, G. S. 1913, omitting the penalty clause, reads as follows:

"No person or association of persons shall enter into any pool, trust agreement, combination, or understanding whatsoever with any other person or association, corporate or otherwise, in restraint of trade, within this state, or between the people of this or of any other state or country, or which tends in any way or degree to limit, fix, control, maintain, or regulate the price of any article of trade,

manufacture, or use, bought and sold within the state, or which limits or tends to limit the production of any such article, or which prevents or limits competition in the purchase and sale thereof, or which tends or is designed so to do."

Defendants contend: (1) That an injunction to restrain a combination prohibited by the statute cannot be granted on the complaint of a private person; (2) that a combination such as there was here is not one in restraint of trade within the meaning of section 8973; (3) that the business of conducting a theatre does not come within the scope of the section.

1. In Paine Lumber Co. v. Neal, 244 U. S. 459, 37 Sup. Ct. 718, 61 L. ed. 1256, it was held that a private party could not maintain a suit for injunction to restrain a violation of the Sherman Act. Section 4 of that act provided that it should be the duty of the district attorneys of the United States to institute proceedings in equity to prevent and restrain violations of the act, and apparently this provision led to the ruling that was made. In Duplex Printing Press Co. v. Deering, 254 U. S. 443, 41 Sup. Ct. 172, 65 L. ed. 349, it was pointed out that by the Clayton Act of October 15, 1914, Congress had supplemented the Sherman Act and given to private parties a right to relief which was withheld by the earlier act, and a decree refusing to grant an injunction at the suit of a private party was reversed. Chapter 493, p. 832, Laws of 1917, is the only statute we have which bears on this subject. Section 2 thereof expressly recognizes the jurisdiction of the district court to grant an injunction in cases of this character, if necessary to prevent irreparable injury to property for which there is no remedy at law. It is urged that equity will not enjoin the commission of a crime. The fact that a theatened invasion of a person's rights, if accomplished, will also constitute a criminal offense, is no bar to relief by an injunction to which such person would otherwise be entitled. In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. ed. 1092; High, Injunctions, § 20a; 5 Pomeroy, Eq. Jur. § 1890; 14 R. C. L. p. 377, et seq. This is a case falling within the rule stated, and hence we do not sustain defendants' first contention.

2. The second and third contentions may be discussed together.

In the so-called Danbury Hat Co. case, the Supreme Court of the United States held that a combination of the same character as the one here was in restraint of trade. The court said that a combination aimed at compelling individuals not to engage in the course of trade except on conditions imposed by the combination, falls within the condemnation of the Sherman Act; that the act makes no distinction between classes and exempts no one from its operation and includes combinations of labor as well as of capital. Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. ed. 488, 13 Ann. Cas. 815. The same court has held that the circulation of a list of unfair dealers, intended to put the ban on those whose names appear therein, among a body of possible customers, is within the prohibition of the act, if it is intended to restrain and does restrain commerce among the states, Lawlor v. Loewe, 235 U. S. 522, 35 Sup. Ct. 170, 59 L. ed. 341, and that the act covers any illegal means by which interstate commerce is restrained, whether the restraint be occasioned by trusts, pools, blacklists, boycotts, or coercion, threats or intimidation by acts, words or printed matter. Gompers v. Bucks Stove & R. Co. 221 U. S. 418, 31 Sup. Ct. 492, 55 L. ed. 797, 34 L. R. A. (N. S.) 874. In Duplex Printing Press Co. v. Deering, supra, it held that a combination was not justified by the fact that the participants had in view some object beneficial to themselves or to their associates, which they might have been at liberty to pursue in the absence of the statute.

The history of the Sherman Act was referred to in the earlier Federal cases and may have influenced the court in its interpretation. An amendment to the act, as originally framed, was offered in the United States senate, but failed to carry. In substance the amendment provided that the act should not be construed to apply to any agreements or combinations among laboring men, made with a view to lessening hours of labor or increasing wages, or to combinations of persons engaged in agriculture. Thornton, Sherman Act, § 16; U. S. v. Debs, 64 Fed. 724, 746; Lawlor v. Loewe, supra. The Sherman Act went into effect July 2, 1890; the original of our own anti-trust act, on April 20, 1891. Its genesis was outlined in State v. Duluth Board of Trade, 107 Minn. 506, 121 N. W. 395, 23

L. R. A. (N. S.) 1260, where it was said that the statute was framed along the lines of the Sherman Act; that the general purpose of all such statutes is the same, and that this court may properly look to decisions made under Federal and state statutes of a similar character for the principle by which to construe our statute.

The principal controversy between the parties in the court below and here is whether our statute applies to a case of this kind. The question is new, not having been directly involved in any preceding case. We answer it in the affirmative.

The tendency of legislation in recent years, as well as judicial thought, has been toward uniformity in the law of this country, statute and common, so far as it may be attained and accomplished by statute or judicial decision. This with a purpose of establishing fixed and definite rules and principles for guidance in the performance of obligations and duties, and protection of rights and the enforcement of liabilities, arising out of our varied activities and industrial life, applicable alike in both Federal and state courts, so that a given transaction in tort or contract and rights and liabilities arising therefrom shall be measured by the same standard in whatever forum it may come for adjudication. The reasons guiding the judicial mind in that direction are well and forcibly expressed by the late Justice Mitchell in National Bank of Commerce v. Chicago, B. & N. R. Co. 44 Minn. 224, 46 N. W. 342, 560, 9 L. R. A. 263, 20 Am. St. 566, in the following language:

"But on questions of commercial law it is eminently desirable that there be uniformity. It is even more important that the rule be uniform and certain than that it be the best one that might be adopted. Moreover, on questions of general commercial law the federal courts refuse to follow the decisions of the state courts, and determine the law according to their own views of what it is. It is therefore very desirable that on such questions the state courts should conform to the doctrine of the federal courts. The inconvenience and confusion that would follow from having two conflicting rules on the same question in the same state, one in the federal courts and another in the state courts, is of itself almost a sufficient reason why we should adopt the doctrine of the federal courts on this question.

To do otherwise, so long as the jurisdiction of those courts so largely depends on the citizenship of suitors, would really result in discrimination against our own citizens."

Upon that course of reasoning the court disregarded, and in effect overruled upon the particular point under discussion, a prior decision of the court (McCord v. Western Union Tel. Co. 39 Minn. 181, 39 N. W. 315, 1 L. R. A. 143, 12 Am. St. 636; 2 Notes on Minn. Reports, 1209), and adopted the rule of the Federal courts on the question involved. The decision has been followed and applied in later cases and with the view of bringing the rules of law in all matters of public concern, excluding purely local regulations, in harmony with those of the Federal courts. Palm Vacuum Cleaner Co. v. Bjornstad, 136 Minn. 38, 161 N. W. 215, L. R. A. 1917C, 1012; Rosemond v. Graham, 54 Minn. 323, 56 N. W. 38, 40 Am. St. 336.

The anti-trust statute of this state, for all intents and purposes, is substantially the same as the Sherman Act which the Supreme Court of the United States, as we have noted, has construed as applying to combinations of employers as well as to combinations of employes and to facts like those disclosed in this case. As heretofore stated, the question of the application of our statute to facts like those at bar is before the court for the first time. It was not involved in State v. Duluth Board of Trade, supra, or in George J. Grant Const. Co. v. St. Paul Bldg. Trades Council, 136 Minn. 167, 161 N. W. 520, 1055, and any statements found in the opinion in either case indicating the view that the statute was intended to have application only to combinations to affect the price or production of useful articles of trade, excluding personal services or labor, were not intended as a decision of the point, or to cover a case like this one. They must, therefore, be limited to the facts there before the court.

No branch of the law and the uniform enforcement thereof is of greater concern to the public weal at the present time than that defining and prescribing the respective rights and obligations of employers and employes, or, to use a hackneyed expression, the relations between capital and labor. In recent years controversies regarding wages, hours of labor and working conditions have be-

come so frequent, so earnest, and the settlement and adjustment thereof so often attended with threatened lockouts, strikes, boycotts and other methods of self-determination, as to become a serious menace to the general welfare, as well as destructive of the best interests of both employer and employe. If uniformity of law and its administration in commercial transactions is essential to the orderly adjustment of rights arising in that field of activity, it cannot well be questioned that for the same and a greater and stronger reason should the law controlling the conduct and rights of employer and employe be definite, clear, and administered in harmony with a single standard in all the courts of the country. It would be an anomalous situation to have the Federal courts sitting in this state administering one rule in the adjustment or control of labor troubles, while the state courts at the same time are administering another and different rule upon the same facts—a condition inviting disrespect for law and leading to confusion and disorder. State v. Chicago, M. & St. P. Ry. Co. 130 Minn. 144, 153 N. W. 320, L. R. A. 1916B, 764. And, since the question is an open one in this state, acting on the rule adopted and applied in the National Bank of Commerce case, we adopt a construction of our statute in harmony with that given by the Federal Supreme Court to the Sherman Act in the cases cited.

Nor have we any misgivings in construing the expression "trade," as used in the statute, to include labor. In fact that would seem the only conclusion justified under the construction given the Sherman Act by the Supreme Court. If the act was intended to apply and does apply to a combination of employers against employes, there is in that combination restraint of trade. For his labor the laborer has nothing which may be the subject of barter and exchange like the goods and chattels of the employer. And, if he is to have the protection of the statute against a combination of employers, his labor, as he offers it in exchange for what it may earn, must be held trade within the meaning of the statute. If this be not so, then the employe is without the protection of the statute. It would shield and protect the employers only—a conclusion not justified by the general scheme and purpose of the law or the con-

struction given it by the Supreme Court. It would be unfair to attribute to the legislature an intent to exclude the laborer from the protection of the statute.

We do not concur in the contention that the business of exhibiting motion pictures is not trade within the meaning of the statute. We have not overlooked the cases cited by defendants in which it has been held that furnishing entertainment to the public is not trade or commerce. It seems clear to us that the only logical conclusion is that the word has been used in its broadest sense and includes business of any kind in which a person engages for profit. 4 Words & Phrases (2d Ser.) p. 955.

3. It is suggested that subdivision (d) of the judgment goes too far and is an infringement of the right of free speech guaranteed by the Constitution. In substance it enjoins defendants from continuing any combination to publish any statement in furtherance thereof in The Labor Review, or otherwise, from which it could reasonably be inferred that plaintiff and his theatre were unfair to organized labor. Whether a notification that a person is unfair might coerce customers from dealing with him, must be determined from all the facts and circumstances of each case. Gray v. Bldg. Trades Council, 91 Minn. 171, 97 N. W. 663, 1118, 63 L. R. A. 753, 103 Am. St. 477, 1 Ann. Cas. 172; Steffes v. Motion Picture M. O. Union, 136 Minn. 200, 161 N. W. 524. If defendants' only purpose was to notify the public that there was a controversy between plaintiff and Local 219, the judgment was too broad, but, if they unlawfully combined to restrain plaintiff's trade and the publications were made in furtherance of the combination and portended injury to plaintiff or his patrons, the judgment was proper. American Federation of Labor v. Bucks Stove & R. Co. 33 App. Cas. 83 (D. C.); 32 L. R. A. (N. S.) 748; Gompers v. Bucks S. & R. Co. supra; Wilson v. Hoy, 232 Ill. 389, 83 N. E. 928, 16 L. R. A. (N. S.) 85, 122 Am. St. 119, 13 Ann. Cas. 82; Gray v. Bldg. Trades Council, supra; Steffes v. Motion Picture M. O. U. supra. It was found that the publications were made in furtherance of the purpose of the combination. The purpose to be accomplished was unlawful. Blows were aimed at plaintiff's business, intended to in-

jure or destroy it, in order to subdue him to the defendants' demands, and the statement that he was unfair was one of them. The right of free speech is abused when words become verbal acts and are then as such subject to injunction as the use of any other force whereby property is wrongfully injured. Gompers v. Bucks Stove & R. Co. supra; Schwartz v. Edrington, 133 La. 235, 62 South. 660, 47 L. R. A. (N. S.) 921, Ann. Cas. 1915B, 1180; Jordahl v. Hayda, 1 Cal. App. 696, 82 Pac. 1079. We hold that the judgment did not go too far in this respect.

4. The rights of labor organizations are defined by chapter 493, p. 832, Laws of 1917, which enacts in the form of a statute principles theretofore announced by the courts. The rights of employers have also been defined. Section 8890, G. S. 1913. There should be no misunderstanding about the restrictions which the law has imposed on both parties to a labor dispute and necessity for resort to the courts should seldom arise. Courts are not adapted to effect settlements of controversies essentially economic in their nature, but when, in the course of such a controversy, fundamental personal or property rights are invaded, the duty of the courts is plain. This is such a case. Serious injury to the personal and property rights of the plaintiff has not only been threatened, but accomplished. Since this opinion was formulated the Supreme Court of the United States has decided the cases of American Steel Foundries v. Tri-City Central Trades Council, 256 U. S. —, 42 Sup. Ct. 72, 66 L. ed. 103, and Truax v. Corrigan, 256 U. S. —, 42 Sup. Ct. 124, 66 L. ed. 132. Under the doctrine they announce, the result in this case would necessarily be the same.

The judgment of the district court went no farther than was justified by the facts and the law and it is accordingly affirmed.

DIBELL, J. (dissenting).

I dissent.

The anti-trust law (G. S. 1913, § 8973), was not intended to apply to labor unions. The statute usually referred to as the original anti-trust law was entitled: "An act to prevent the organization of trusts and to provide in certain cases for the forfeiture of the

charter of corporations organized under the laws of this state, and to prevent corporations, trusts or combinations under certain circumstances from doing business or enforcing contracts in respect thereto, under the laws of this state." Laws 1899, p. 487, c. 359. Two years later an act entitled:' "An act preventing and restraining operations of pools, trusts and conspiracies," was passed. Laws 1901, p. 269, c. 194. These two statutes were repealed by the revision of 1905, but were the basis of sections 5168 and 5169 of the revision, incorporated in G. S. 1913, §§ 8973, 8974. The act of 1891 was enacted soon after the people of the state by the amendment of 1888 had put into the Constitution a provision directed against combinations to monopolize the markets for food products or to restrict their freedom, and had made such a combination a conspiracy to be punished in such manner as the legislature might provide. Const. art. 4, § 35. The anti-trust statute is a criminal statute and is placed among the criminal statutes in the revision. A violation of it is a felony. When it was passed there had long been in force, and is now, a statute providing that the peaceable assembling and coperating in any calling or trade to obtain an advance in wages or to maintain a rate is not a conspiracy within the statute defining conspiracy. G. S. 1913, § 8596. By Laws 1917, p. 832, c. 493, it is declared that labor is not a commodity or article of commerce.

The anti-trust statute closely follows its title and suggests as its object combinations in restraint of trade and commerce by fixing prices or limiting the production or sale of commodities. Nothing is said about labor. If labor comes within the statute it is because construed to be a commodity, or an article of utility, or of trade or of commerce. The statute does not suggest the inclusion of labor. The other legislation mentioned suggests its exclusion.

The statute was construed in State v. Duluth Board of Trade, 107 Minn. 506, 121 N. W. 395, 23 L. R. A. (N. S.) 1260. The question was upon the validity of a rule of the board fixing charges for the services of members of the board. The court said: "Labor, whether physical, intellectual, or a combination of the two, is not by any fair rule of construction 'an article of trade, manufacture, or use,' or an 'article,

commodity or utility' which 'enters into the manufacture of any article of utility,' within the meaning of those words as used in the statute." The court cited Rohlf v. Kasemeier, 140 Iowa, 182, 118 N. W. 276, 23 L. R. A. (N. S.) 1284, 132 Am. St. 261, 17 Ann. Cas. 750. There the court held that a combination of physicians to fix fees was not within the anti-trust law. It said that labor was not a "commodity" like merchandise, and that the statute was directed against "unlawful conspiracies * * * in restraint of trade, and was manifestly not intended to cover labor unions." The board of trade case may not easily be brushed aside as valueless by a suggestion that it did not involve a labor union. It did not. It did involve the fixing of a price for services of members of the board, as the Iowa case involved the fixing of fees of physicians. In neither case were such services thought within the anti-trust law; and both referred to labor as not a commodity and as not different in the view of the law from skilled or professional services whether or not involving manual work in the ordinary sense.

Whether it is desirable that our anti-trust law conform to the Federal anti-trust law is a matter of legislative, not **judicial, concern.** When the court construes the law, judicial duty is at an end. Whether there shall be uniformity of the two and consequent centralization is for the legislature. It is a question of policy. The question put to the court is one of statutory construction; and it is something quite different from molding common law doctrines to harmonize with the weight of authority, as often is done, especially in matters of general commercial law. Often the legislature in matters of local law declines to adopt the policy of the Federal law, covering a like subject matter, enacted under the commerce clause. Taking all our legislation together, having in mind the time and occasion of its enactment, the provision of the Constitution, and the natural and apparently plain meaning of the words of the anti-trust law directed against combinations dealing in commodities and operating in restraint of trade, it should not be held that the legislature intended to include labor unions.

The plaintiff contends that, in any event, the injunction can be sustained on common law principles. There was no wage dispute

or strike trouble between the plaintiff and the defendants. The question is one of boycott. There were picketing and bannering by the defendants. There was counter bannering for a short while by the plaintiff. There was disorder. In some of it the plaintiff was a participant, and perhaps the aggressor. But assuming that the bannering and picketing were conducted with threats and intimidation and attended with disorder, as found by the court, to such an extent that an injunction was justified on common law principles, that granted went too far.

As the trouble started it was much a question whether the plaintiff should be permitted to conduct his show by operating his machine with his personal labor. The right so to do was emphatically stated in the Roraback case, 140 Minn. 481, 168 N. W. 766, 169 N. W. 529, 3 A. L. R. 1290. After the hearing upon the temporary injunction the plaintiff employed two men as operators and largely ceased personal work. The court finds that "from June 18, 1917, [the date of the denial of a temporary injunction], down to the time of the trial [September, 1919], plaintiff continuously employed and used solely operators who did not belong to said local; in other words, nonunion operators;" and in its memorandum it says that "after the hearing [of] the motion for a temporary injunction in June, 1917, and down to the time of the trial, Campbell had relinquished the greater part of his machine operating work to operators who were not union men, and that he was not employing any union operators whatever." From then on the case was more like the Steffes case, 136 Minn. 200, 161 N. W. 524. There it was said that picketing or bannering is not in itself unlawful. Such is the general rule. That it cannot rightfully be conducted so as to constitute violence, intimidation or coercion, or to amount to a nuisance, is clear. When so conducted it is unlawful. That the plaintiff had the legal right—a right entitled to protection—to work in his theatre as an operator, or to conduct his business on the open shop plan, admits no denial. Assuming, in accordance with the findings, that bannering and picketing had gone so far that it was properly restrained, regardless of the anti-trust statute, the injunction goes too far in restricting the activities of the defendants. The local,

like other locals, was affiliated with the Trades Assembly. The Labor Review was the official organ of the assembly. It was devoted to the interests of union men among whom it largely circulated. In the economic struggle they had a certain solidarity or community of interest. Passing without discussion the question of constitutional right, I am unable to see a justification for restraining the defendants from getting to the public in a peaceable way their interpretation of the trouble, or the view point of union labor, or for restraining the publication in the union paper of the "We Do Not Patronize List," or of news items or editorial comment upon the trouble with the plaintiff, or of vigorous advocacy of the attitude and the right of labor in the particular controversy. There was nothing vicious in character published. It is going a long way, so it seems to me, for equity to restrain the peaceful activities of labor or to supervise the conduct of a trade paper in the midst of a class struggle. Such a struggle is likely to become heated; it is not usually fair on either side; both contestants have their papers and sympathizers, and neither side is judicial. If the anti-trust law applies to unions, as does the Federal act, and Federal decisions are adopted, as now held in the majority opinion, there is authority for the injunction in the form in which it is framed; indeed, if that view is adopted, and some of the rulings under the Federal law are followed, the community of interest among laborers justifying a combined attack or defense by them is restricted and their right of free expression and open advocacy of their views is limited. See Duplex Printing Press Co. v. Deering, 254 U. S. 443, 41 Sup. Ct. 172, 65 L. ed. 349; Gompers v. Bucks Stove & R. Co. 221 U. S. 418, 31 Sup. Ct. 492, 55 L. ed. 797, 34 L. R. A. (N. S.) 874.

For the reasons stated I think that labor is not a commodity or article of commerce within the anti-trust statute; that the statute does not apply to labor unions; and that the injunction, assuming that, under the findings, one was proper irrespective of the statute and on common law principles, went too far in restricting the activities of the defendants in peaceably putting the situation as they claimed it before the public, and in their advocacy of their claims and their views through their newspaper organ.

HALLAM, J. (dissenting).

I agree with Justice Dibell that the Minnesota statute does not cover this case. Common law principles may have justified an injunction in this case, but the majority opinion is not predicated on that theory and I do not discuss the question.