## JOHNSON v. MILK DRIVERS & DAIRY EMPLOYEES UNION, LOCAL NO. 854.

### No. 6148.

Court of Appeal of Louisiana. Second Circuit.

April 4, 1940.

Geo. W. Hardy, of Shreveport, for appellant.

Chas. E. Tooke, Jr., of Shreveport, for appellee.

DREW, Judge.

The lower court has set out and determined the issues in this case in a well-written opinion, which is as follows:

"There is presently existing a labor dispute between Riverside Jersey Farms and drivers who are members of the defendant

union. Leon Johnson operates a grocery store and is a large retail dealer of the milk produced by this dairy, handling two or three hundred quarts per day. Following the strike by the drivers of this dairy, members of the local, together with the drivers, called on Mr. Johnson to assist them in the strike by discontinuing the handling of the milk of this concern. Mr. Johnson declined this request. Beginning on Friday, December 15, 1939, these drivers began to patrol in front of and in the vicinity of the Leon Johnson grocery store. Circulars advising of the strike at Riverside Jersey Farms were distributed. Signs were exhibited which called attention to the strike. Prior to a hearing on this suit, the signs were changed to read as follows:

> " 'Riverside Jersey Farms
> Is
> Unfair
> To
> Milk Drivers
> Local No. 854
> Affiliated with A. F. of La.'

"Two such signs are now being displayed and the testimony is to the effect that the distributing of circulars has been discontinued. No attack has been made on the grocery store as being unfair to organized labor and no effort is being made to prevail on customers to discontinue their business with this plaintiff, breach of the peace or threat thereof.

"The evidence discloses that Mr. Johnson's store is back from the sidewalk some distance so that a drive-in parking space could be provided in front of his store. This resulted in the usual sidewalk space being used for the parking of cars. In lieu thereof, a sidewalk of some eight feet in width was provided, which adjoins the building of the plaintiff. On complaint that this was his private property, defendants moved out on the edge of the street without complaint. While it may be true that this is a private sidewalk, we are of the opinion that the sidewalk furnished by plaintiff for the public in lieu of the regular space utilized by his customers for parking is certainly 'a place where any person may lawfully be', as contemplated by Act 203 of 1934.

"In plaintiff's petition for the injunction, he makes as the basis for this order the following allegations:

" '4. That petitioner is informed, believes and therefore alleges upon information and belief that there exists at the present time a dispute between the owner and operator of the said Riverside Jersey Farms and the members of the Milk Drivers and Employees, Local No. 854, but that petitioner is not a party to said dispute nor has he any interest therein nor is he concerned therewith in any manner or degree whatsoever, and petitioner specifically alleges that he is not involved in any labor dispute of any kind or character with any person, association of persons or any organization.

" '5. Petitioner shows that on Wednesday, December 13, 1939, he was approached by certain members of the Milk Drivers and Employees Local No. 854 who made verbal demand upon petitioner to cease handling milk or any other dairy products of the Riverside Jersey Farms and was warned that upon his failure to cease handling said products his business establishment would be picketed with a view of forcing petitioner to cease handling said products.

" '6. That at about 9:30 A. M., on Friday, December 15, 1939, members of the Milk Drivers and Employees Local No. 854 began an organized picketing of petitioner's business establishment and since said time have been and are now engaged in the following practices:

" '(a) Several members of the Milk Drivers and Employees Local No. 854 carrying large painted signs affixed to sticks of wood several feet in length, patrol the space immediately in front of petitioner's business establishment at the premises above described.

" '(b) That in the process of patrolling the space in front of petitioner's establishment, the members of the above named local, not only occupy and patrol the space on the street and the street side of the property line, but actually encroach and trespass upon petitioner's private property immediately in front of the premises above described.

" '(c) That the parties patrolling the premises and the vicinity of the premises described both stand and march in front of vacant parking spaces impeding and interfering with the driving in and parking of cars belonging to petitioner's customers, thereby causing annoyance, inconvenience and creating a traffic danger and hazard, with a probability of causing or contributing to the causing of accident and injury to both themselves and others.

" '(d)  That the persons patrolling said premises stand and march both in front and behind cars parked in the drive-in parking space immediately in front of petitioner's establishment, making both the entry of cars into parking spaces and their departure therefrom extremely hazardous and dangerous and causing delay, inconvenience and difficulty and danger of operation of cars to the drivers and passengers thereof who are customers of petitioner.

" '(e)  That the signs carried by the persons patrolling as above described are large and bulky and interfere with the view of automobile drivers and impede the free and convenient passage of pedestrians as well as obstructing the operation of automobiles both on petitioner's property and in the street immediately in front thereof.

" '(f)  That several persons, members of the said named Local No. 854, stand on the sidewalk in front of petitioner's place of business, which sidewalk is on the private property of petitioner, distributing circulars and handbills bearing upon a purported strike by union laborers, in the course of which actions the passage of petitioner's customers, as well as other pedestrians and their entrance into and exit from petitioner's place of business are delayed, impeded and hindered to the annoyance of petitioner's customers and consequent loss and damage to petitioner.'

"There has been no contention that anything false was contained in the circulars. In oral argument plaintiff's counsel complains of the fact that the word 'unfair' is displayed prominently on the sign. We cannot agree that there is anything misleading in the sign as produced in court. Counsel also complained of the other signs which were being displayed in this respect. If there was any merit in the contention, no relief could be granted for no such complaint is made in the pleading, and Act 203 of 1934, Section 8, provides:  ' *  *  * and every restraining order or injunction granted in a case involving or growing out of a labor dispute shall include only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case *  *  *.'

"It is necessary to determine in this case whether a dispute exists as defined by Act 203 of 1934, and therefore whether this act is applicable.  It is also necessary for the court, in deciding this case, to determine if a 'secondary boycott' exists in this instance.

These two questions are so closely related that they shall be treated together.

"Legislation on the issuance of injunctions in labor disputes began with the Clayton Act, 38 Stat. 730, passed by the United States Congress.  The decision of the United States Supreme Court in Duplex Printing Company v. Deering, 254 U.S. 443, 41 S. Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196, resulted in the passage of the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq.  This act in effect followed the doctrine expressed by Justice Brandeis in his dissenting opinion in the Duplex case, wherein he objected to an interpretation of the act that would only include those cases where the direct relation of employer and employee were involved.

"Subsequent to the passage of the Norris-LaGuardia Act by Congress, our Legislature enacted the same legislation when it passed Act 203 of 1934.  There is no substantial difference in these acts.

"The important provisions of this act, insofar as they affect this case, are found in Sections 3, 6 and 12 thereof.  Section 3 provides as follows:

" 'No court, nor any judge or judges thereof shall, or, have jurisdiction to, issue any restraining order or temporary or permanent injunction which in specific or general terms prohibits any person or persons from doing, whether singly or in concert, any of the following acts:  *  *  *

" '(e)  Giving publicity to and obtaining or communicating information regarding the existence of, or the facts involved in, any dispute, whether by advertising, speaking, patrolling any public street or any place where any person or persons may lawfully be, without intimidation or coercion, or by any other method not involving fraud, violence, breach of the peace, or threat thereof;

" '(f)  Ceasing to patronize or to employ any person or persons;  *  *  *

" '(h)  Advising or notifying any person or persons of an intention to do any of the acts heretofore specified;  *  *  *

" '(j)  Advising, urging, or inducing without fraud, violence, or threat thereof, others to do the acts heretofore specified, regardless of any such undertaking or promise as is described in Section 2 of this Act;  *  *  *.'

"In other words, if a labor dispute exists, then the court is powerless to issue an in-

junction, except in those cases involving fraud and violence of some form.

"Where an injunction is issued, the court in doing so, among other things, must find as a fact, under Section 6, subsection (d), 'that no item of relief granted is relief that a court or judge thereof has no authority to restrain or enjoin under Section 3 of this Act.'

"Section 12 defines the important terms of the act with reference to dispute, etc. We shall quote this section in part:

"'When used in this Act, and for the purpose of this Act—

"'(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in a single industry, trade craft, or occupation; or who are employees of one employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers * * * or employees engaged in such industry, trade, craft, or occupation.

"'(c) The term "labor dispute" includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, or concerning employment relations, or any other controversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand in the proximate relation of employer and employee.'

"We have concluded that this case does not present a true 'secondary boycott' and also that it involves a dispute as provided by Act 203 of 1934.

"In every case which we have read holding a 'secondary boycott' existed, the facts showed that trade or commerce in general was attempted to be stopped. If these defendants were by circulars, signs and conduct charging the petitioner as being unfair to organized labor and soliciting their friends to refrain from patronizing this business, then we would have the situation usually termed a 'secondary boycott'. As we have heretofore stated, this is not being done by these defendants. They are merely pursuing the product of their employer and advertising in a manner and method authorized by the provisions of Act 203 of 1934.

"In the recent case of Senn v. Tile Layers Protective Union, 301 U.S. 468, 57 S.Ct. 857 [862], 81 L.Ed. 1229, in which Justice Brandeis was the organ of the court, the statute of Wisconsin was under review and, after quoting from the section which was identical with Section 3 of Act 203 of 1934, the court said: 'Inherently, the means authorized are clearly unobjectionable. In declaring such picketing permissible, Wisconsin has put this means of publicity on a par with advertisements in the press.'

"Certainly there could be no complaint if the members of this defendant union were able to daily carry such notices in the local press that they are now carrying in front of petitioner's store. This construction by Justice Brandeis, we think, correctly reflects the intent behind such legislation.

"We can hardly conceive of a more broad and inclusive act of the Legislature than the one now presented to the court, and so long as the picketing or publicity does not involve violence or fraud of some character, the courts are absolutely without jurisdiction to issue injunctive relief.

"The leading case on this subject and one involving practically the same situation as is now presented to the court arose in the State of New York in the case of Goldfinger v. Feintuch, 1937, 276 N.Y. 281, 11 N.E.2d 910 [913], 116 A.L.R. 477. In this case employees were having a dispute with their employer, who was a manufacturer. They began to peacefully picket a retailer who was handling the manufacturer's product and the court declined to issue an injunction. We quote herewith some of the statements found in that decision. 'Concededly the defendant union would be entitled to picket peacefully the plant of the manufacturer. Where the manufacturer disposes of the product through retailers in unity of interest with it, unless the union may follow the product to the place where it is sold and peacefully ask the public to refrain from publishing it, the union would be deprived of a fair and proper means of bringing its plea to the attention of the public.'

"That same unity of interest or relationship exists in this case between the producer or dairyman and the retailer of the milk, who operates a grocery store.

"In the Goldfinger case, the same contention was made that the act was not

applicable to the parties to the suit and in answer to that contention the court said: 'The only ground that could be advanced for contending that the statute is not applicable is that the plaintiff is not the employer of the men whom the defendant seeks to represent; but the statute expressly provides that it is applicable to parties in the same industry, "regardless of whether or not the disputants stand in the relation of employer and employee." '

"So in the statute in this state, which we have quoted herein in Section 12, Sub-section (c), it is provided: ' * * * or any other controversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand in the proximate relation of employer and employee.'

"Certainly, it is to the interest of the employees to inform the public and secure their assistance in their dispute with the Riverside Jersey Farms. The most effective way that is offered them is at the point of distribution of the product. In an article on this subject in the Louisiana Law Review by J. Denson Smith, Associate Professor of Law at Louisiana State University, the following observation of this practice is made: 'Obviously enough, if the picketing is successful, the retailer may be compelled in self-protection to cease stocking the manufacturer's product. However, exactly the same thing would happen if picketing at the manufacturer alone should be sufficient. Yet no one would suppose in the latter case that the manufacturer would be entitled to relief merely because the picketing of the factory was successful in stopping retail sales elsewhere. Therefore, those courts that recognize the legality of picketing of this kind at the place where the goods are retailed are taking the proper view of the matter.'

"In his concurring opinion in the Goldfinger case, Judge Lehman made the following observation on the question of a secondary boycott: 'I agree that peaceful picketing of the plaintiff's place of business by the defendant union for the purpose of inducing the plaintiff's customers to refrain from buying nonunion products of a manufacturer, which are on sale by the plaintiff, is lawful. That is not a "secondary boycott." '

"This is exactly the situation that has been shown to exist in the case now before the court.

"Similarly, in Manhattan Steam Bakery v. Schindler, 1937, 250 App.Div. 467, 294 N.Y.S. 783 [786], it was held that as against a plaintiff which delivered its bakery products to retailers in trucks operated by non-union drivers, union members did no more than exercise legitimate means of economic coercion where without malice, force, violence or intimidation, they followed the plaintiff's vehicles to the retailer's places of business and upon the latter's refusal to discontinue the purchase and sale of the plaintiff's product, picketed their stores with signs stating in part,—'This Store Receives Rolls and Bread Delivered by Non-Union Drivers'. The court refused the injunction and held that a labor dispute existed under the provisions of their law on the ground that there was a definite industrial relation between the sale of the plaintiff's products and the aims and objects of the defendant.

"So in this case, there is a definite relation and interest between the sale of the products of the Riverside Jersey Farms by the plaintiff, Leon Johnson, and the aims and objects of the defendant. To the same effect are two other decisions from New York, viz; Public Baking Company v. Stern, 127 Misc. 229, 215 N.Y.S. 537, and Engelmeyer v. Simon, 148 Misc. 621, 265 N.Y.S. 636. In the latter case, it was held that the action of a union whose member had been locked out by a wholesale bakery, in picketing the places of business of some of the baker's customers with placards advertising the union label and requesting sympathizers only to purchase bread with the union label, did not amount to a secondary boycott, and, in the absence of threat, coercion, intimidation or fraud, was not illegal.

"The petitioner herein has cited a number of cases in support of his application for an injunction. We have carefully read each one of these cases. They are not applicable for either the reason that the statutory law was not modeled after the Norris-LaGuardia Act, or either involved fraud, misrepresentations, violence, intimidation or some other illegal act on the part of the defendants. We shall now discuss those cases relied upon by plaintiff.

"In Meadowmoor Dairies v. Milk Wagon Drivers Union, etc., 371 Ill. 377, 21 N.E.2d 308 [313], the court pointed out that their statute was modeled after the Clayton Act, which provides that 'the party to such dis-

pute' is limited to employer and employee. It seems that the words 'party to a labor dispute' in the Illinois act must necessarily receive the same construction. In that case there was also findings of violence, assaults, throwing of stink bombs which under our law would authorize the issuance of an injunction.

"In the New York case of Grandview Dairy v. O'Leary, 158 Misc. 791, 285 N.Y.S. 841, the court found that a secondary boycott existed together with threats and intimidation. It is to be observed also that this was a decision of the Supreme Court, Queens County, which corresponds with our district courts, while the Goldfinger case was decided by the Court of Appeals of New York, which is the court of last resort and was decided one year subsequent to this decision.

"The case of George F. Stuhmer & Company v. Korman et al., 241 App.Div. 702, 269 N.Y.S. 788, is of no value in this case. It was decided prior to the New York law which was modeled after the Norris-LaGuardia Act of Congress and was not a decision of a court of last resort in that state.

"In the case of Chapman v. Doe et al., 255 App.Div. 893, 7 N.Y.S.2d 470, the court found that a true secondary boycott existed in the case and issued an injunction. This was not a decision of the court of last resort and amounted to only a decree as no other reasons were given for the opinion.

"In Driggs Dairy Farms, Inc., v. Milk Drivers' & Dairy Employees' Local Union No. 361 et al., 49 Ohio St. 303, 197 N.E. 250, 251, an injunction was issued to restrain the displaying of banners in front of retail stores which sold plaintiff's milk. In this case the court found facts that under any construction would constitute a true secondary boycott in addition to the banners containing false statements. In addition, nothing in this opinion that would indicate that Ohio had a law similar to the Norris-LaGuardia Act or the laws of the State of Louisiana on the issuance of an injunction.

"In Wiest v. Dirks, Ind.Sup., 20 N.E.2d 969, the court issued an injunction on finding that the banners were false and misleading. This case fails to disclose the provisions of the Indiana act. However, under our law, the use of false and fraudulent signs could and would be enjoined by the courts.

"Judge Dawkins, of the Federal District Court, issued an injunction in Fehr Bakery Company v. Bakers' Union et al., D.C., 20 F.Supp. 691, [697], on the grounds that no labor dispute was involved, and for the further reason that a true secondary boycott existed. In that case the unions in Lake Charles were attempting to compel local dealers to cease handling bread from Houston and Beaumont, Texas. The court said in that case: 'It is also admitted in part, and I think proved otherwise, that those grocers and other dealers who refused to sign the agreement to handle only local products, but continued to sell plaintiff's bread, had their places of business picketed as unfair to organized labor.'

"The Indiana case of Muncie Building Trades Council et al. v. Umbarger et al., Ind.Sup., 17 N.E.2d 828, is also cited, but not as authority for the plaintiff's petition in this case. An injunction was granted in that case and, according to the opinion, there was evidence of violence of an unusual degree, together with evidence of blockading of public streets.

"In the case of Swing et al. v. American Federation of Labor et al., 298 Ill.App. 63, 18 N.E.2d 258, the court granted an injunction and was careful to point out that their law was still the same as the Clayton Act and that the State legislature had not followed Congress in the adoption of laws similar to the Norris-LaGuardia Act. On that ground they distinguished their case from those arising in Wisconsin, New York and other states.

"For the reasons assigned, we find that no true secondary boycott exists in this case and further that there is a dispute as defined by Act 203 of the Louisiana Legislature for 1934. Therefore, this court is without jurisdiction to issue an injunction in view of the failure of the plaintiff to allege or prove violence, fraud, intimidation, etc.

"We make no findings of fact, as provided for in Section 6 of Act 203 of 1934, for the reason that there is no material difference between the parties as to the true facts in the case.

"By agreement, the evidence taken on the rule for preliminary injunction is to be made applicable to the prayer for a permanent injunction.

"For the reasons assigned, the rule nisi heretofore issued is recalled and the de-

mands of plaintiff for a temporary and permanent injunction are rejected, at his cost."

Judgment was signed in accordance with said opinion and, at the request of plaintiff, the lower court certified the entire record to this court for us to review.

In this court appellant argues that if the court should hold that Act 203 of 1934 is applicable to the case, it does not have the effect of legalizing those things which were illegal or of making lawful those acts which were unlawful. In connection with this contention, appellant points out that the word "unfair" on the sign or placard used by the pickets was on a line to itself, was printed in larger type and was more striking to the eye than any other part of the placard, and that it was calculated to convey the impression to the customers and pedestrians that plaintiff himself was unfair to union labor.

We do not think this position well taken. The word "unfair" by itself could not convey any meaning as to who was unfair, without reading it in connection with the rest of the sign; and in large letters just above the word "unfair" is "Riverside Jersey Farms", and on a line between the two is the word "is". The whole placard is in large, plain letters and all of it can be easily read at a glance. It would be most unusual for anyone to misinterpret the meaning conveyed by the sign.

The sign displayed at the beginning of the strike and discontinued before trial below is equally as clear in its meaning, that is, that the Riverside Jersey Farms was on the "We do not Patronize" list and therefore requesting the public not to buy the products of the Riverside Jersey Farms which were handled by the plaintiff. Plaintiff's name appeared on neither placard nor sign and neither sign was in any way misleading.

The contention of plaintiff that the pickets trespassed upon the private property of plaintiff is correctly disposed of by the lower court in its opinion.

Appellant further contends that the acts of the pickets were unlawful in that they interfered with customers and created unnecessary hazards in the passage of pedestrians. We do not think the record establishes the correctness of the charges and it is our opinion that the picketing was lawful and as quiet and peaceful as it is possible for picketing to be; and it was clearly the intention of the pickets to stay within the law in every respect.

We find no error in the opinion of the lower court and it is affirmed, with costs.

TALIAFERRO, J., concurs in final decree, but dissents in other respects.

TALIAFERRO, Judge.

I concur in the final decree in this case, but dissent from that part of the opinion which inferentially recognizes the right of pickets in labor dispute to patrol on private property. To permit such to be done, it is easy to conceive, could, and in many cases would, lead to far-reaching mischief and disorder. It would be violative of rights and privileges vouchsafed to owners of real property by the state and federal constitution.