(No. 24890.—)

THE MEADOWMOOR DAIRIES, INC., Appellant, *vs.* THE MILK WAGON DRIVERS' UNION OF CHICAGO NO. 753 *et al.* Appellees.

*Opinion filed April 14, 1939—Rehearing denied June 7, 1939.*

FARTHING, J., dissenting.

DENEEN & MASSENA, WILLIAM A. PARRILLO, JOSEPH R. ROACH, and EDWARD M. KEATING, (CHARLES S. DENEEN, and DONALD N. SCHAFFER, of counsel,) for appellant.

DAVID A. RISKIND, and ABRAHAM W. BRUSSELL, (WALTER F. DODD, of counsel,) for appellees.

Mr. JUSTICE GUNN delivered the opinion of the court:

Appellant, the Meadowmoor Dairies, Inc., filed a bill of complaint in the superior court of Cook county on February 2, 1935, to restrain and enjoin the Milk Wagon Drivers' Union of Chicago, Local 753, and various persons connected with the union as president, secretary, trustee and attorney, and the members thereof, from interfering or attempting to interfere with the sale of the appellant's products by picketing stores where its milk was sold or offered for sale, and from using violence against said stores and doing other unlawful acts in furtherance of an alleged conspiracy to injure the business of appellant, and from interfering with certain individuals, hereafter referred to as vendors, who purchased the milk from the appellant and resold it to stores or individuals. A preliminary injunction was issued but it was later modified to permit peaceful picketing of the appellant's plant. The appellees answered denying the allegations of force, violence and conspiracy, but admitted that they did cause peaceful picketing of certain stores which sold appellant's products, by having individuals carry banners or placards bearing thereon the words: "This store is unfair to Milk Wagon Drivers' Union, Local 753." The appellees allege they have a right to thus peacefully picket, as they claim terms and conditions of employment are involved as defined in the Anti-Injunction statute of the State of Illinois. Ill. Rev. Stat. 1937, chap. 48, par. 2a.

The members of the defendant union are employed upon a weekly basis by dairies competing with the Meadowmoor company and have certain definite hours of work and deliver the milk, as employees, to customers of their employers. They have certain routes, solicit business and are paid a premium above the fixed minimum of sales. The Meadowmoor company does not follow this system. It sells its milk direct to certain individuals designated in the record as vendors, who own or rent delivery trucks, sell directly

to stores and establish routes and sell from house to house and do their own collecting and retain the money so collected. The so-called vendors are not members of the union and do not follow the rules of the union with respect to hours of work or times of delivery, and their compensation depends upon how much milk they are able to sell to the customers they procure.

The appellees claim that disposing of milk in this way is injurious to the members of the union and has caused a number of them to lose employment because the appellant's milk was sold at a lower price than that of their employers. Appellees frankly admit that it is the system of vending or selling milk to purchasers at the plant, who, in turn, resell and deliver, to which they object. It is claimed this system brings about a situation which causes a dispute concerning terms and conditions of employment, thereby authorizing them to peacefully picket the stores purchasing milk without being restrained by injunction, except for the use of force or violence.

Evidence was heard before a master in chancery who recommended that a permanent injunction be issued against violence, unlawful actions and picketing of any kind. The superior court did not follow the recommendations, in full, but entered a decree enjoining all unlawful acts and acts of violence but permitted the picketing of stores buying appellant's products, and the vendors buying and reselling, by peaceable means including the carrying of the placards and banners above mentioned. From this decree appellant has appealed directly to this court claiming constitutional questions are involved. The appellees, by cross-appeal, claim that an injunction restraining the carrying of banners in a peaceable manner would restrict the right of free speech guaranteed by the Federal and State constitutions.

The appellant asserts its constitutional rights have been impaired by the judgment of the lower court in that its right to do business freely and without interruption has

been illegally affected by the acts of the appellees. In reply to this claim appellees assert that with respect to the issue involved in this suit the right claimed by appellant, if it ever existed, is inferior to appellees' right to improve, by any peaceful means, the terms and conditions of labor, and that the rights claimed by appellant have been limited to such an extent that no relief in equity against the acts complained of is allowed, and the damages, if any, come within those for which no remedy is provided. It is, therefore, necessary to examine the claim of the appellant with respect to its general right to be free from unlawful interference, interruption or intermeddling in the carrying on of its own business and to what extent it has been limited or deprived of the protection of judicial decree, for if such right never existed, or if it did exist and has been taken away, the case falls without regard to the affirmative claims of defendants.

At common law every man has full freedom in disposing of his own labor or capital and any one who maliciously invades that right by misrepresentation, fraud or coercion is liable, because such acts constitute unlawful competition. (*Doremus* v. *Hennessy*, 176 Ill. 608; *Purington* v. *Hinchliff*, 219 id. 159.) He has a right to free and open market in which to purchase materials to do business and any one who invades such right without lawful cause commits a legal wrong. (*Carlson* v. *Carpenter Contractors' Ass'n*, 305 Ill. 331, 27 A. L. R. 625; *Carpenters' Union* v. *Citizens Committee*, 333 id. 225, 246.) He has a right to enter into lawful contracts and any one who maliciously interferes by inducing such contracts to be broken, or by doing things which make them impossible of performance, is likewise liable. (*Angle* v. *Chicago, St. Paul, Minneapolis and Omaha Railroad Co.* 151 U. S. 1; *Carpenters' Union* v. *Citizens Committee, supra.*) It is likewise illegal to persuade or coerce persons dealing with one in business into discontinuing such dealings by threats of injury to such customers by means commonly called a secondary boycott. (*Duplex*

*Printing Press Co.* v. *Deering,* 254 U. S. 443; *Auburn Draying Co.* v. *Wardell,* 227 N. Y. 1; *Godin* v. *Niebuhr,* 236 Mass. 350, 128 N. E. 406; *Purington* v. *Hinchliff, supra; Fenske Bros.* v. *Upholsterers Union,* 358 Ill. 239; *Wilson* v. *Hey,* 232 id. 389; *Beck* v. *Railway Teamsters' Protective Union,* 118 Mich. 497, 77 N. W. 13; 2 Cooley on Torts (4th ed.) p. 199.) These rights constitute property, and access to one's place of business or the enjoyment of the good will attending it are incidents of property. (*Ossey* v. *Retail Clerks' Union,* 326 Ill. 405; *Mathews* v. *People,* 202 id. 389, 401; *Truax* v. *Corrigan,* 257 U. S. 312, 66 L. ed. 254.) The foundation of the action is not necessarily the intent to injure, as a person may injure a person by a lawful act and intend to do so. The controlling feature is the malice which accompanies the intent to injure, which is manifested by the doing of an unlawful act, and for such purpose the injuring of the person in the enjoyment of his right to do business or to have employment is the unlawful act which, coupled with acts accompanying it, create the cause of action. *Mogul S. S. Co.* v. *McGregor,* L. R. 15 Q. B. D. 476; *Doremus* v. *Hennessy, supra;* 2 Cooley on Torts, (4th ed.) sec. 227; *Anderson* v. *Moskovitz,* 260 Mass. 523, 157 N. E. 601.

The cases above cited furnish illustrations to show that at common law an action lies in favor of an employer, an employee, or a person injured by procuring a breach of contract or by an unauthorized interference with the right to do business.

The question arises to what extent have these general rights been modified or limited by the fact that the interference is caused by employees, or by persons who believe they have a right to interfere in an otherwise legitimate business enterprise because of its general effect upon their particular employment. The situation calling for determination of this question has usually arisen in cases between the employer and employee. In respect to this relation there has been a modification, and, in many instances, a

complete change in the rule of the common law. In Illinois, by statute, it is provided that no contract requiring an employee to refrain from joining a union is valid (Ill. Rev. Stat. 1937, chap. 48, par. 2b) whereas, prior to such enactment, the Supreme Court of the United States had held that such a contract might be enforced. (*Hitchman Coal and Coke Co.* v. *Mitchell,* 245 U. S. 229; *Eagle Glass and Manf. Co.* v. *Rowe,* 245 id. 275.) The Illinois Anti-Injunction act provides that equitable relief shall not be given by injunction in labor disputes where certain enumerated peaceful methods are used, and, generally speaking, it has been held that employees may combine for the purpose of obtaining lawful benefits for themselves, and peaceful picketing or persuasion is lawful in a situation involving the terms and conditions of employment in a labor dispute. (*Fenske Bros.* v. *Upholsterers Union, supra.*) However, in the same case it is said, at page 248: "We also held that the law gives no sanction to combinations, either of employers or employees, which have for their immediate purpose the injury of another."

It is claimed that the Illinois Anti-Injunction act controls the situation presented by the facts in this case. If it does, the act must be construed to be broad enough to apply to the different kinds of interference enumerated above and to secondary boycotts. The claim is made by appellees that no injunction may be issued in any case involving terms or conditions of employment, generally. The argument is made that the system of vending and delivering milk, used by the appellant, had the effect of causing members to withdraw from the appellee union or lose employment, and therefore a labor condition was brought about which authorized them, in self-defense, to peacefully picket the customers buying the milk, either from appellant or the vendors, in order to present appellees' side of a labor controversy.

The Anti-Injunction act is not as broad as claimed by appellees. It consists of one section which specifies eight different matters, growing out of the terms or conditions

of employment, against which an injunction may not be procured by any party to a labor dispute. It is the specified acts in a labor dispute between parties, that come within the act, and the act does not purport to prevent persons or corporations not parties to a labor dispute from protecting their business or property by injunction. The act does not prohibit injunctions in all matters which affect employment, but only in labor disputes which affect employment. A careful reading of the act discloses it was intended to apply in cases where employees have a dispute with their own employer relative to terms and conditions of employment, or where similar questions are involved in a labor dispute between several groups of employees and employers. Under the chapter of our statutes entitled "Employment," (Ill. Rev. Stat. 1937, chap. 48,) the terms "employer," "employee" or "employment" are uniformly used to designate the relation of master and servant, unless in cases where the statute is intended to reach other relations where appropriate descriptive words are used to bring about the desired result. A labor dispute concerning employment could not be reasonably said to exist if an owner and producer of milk should make his own deliveries; nor if an association of coöperative workers should operate a mine or other industry and in such manner come into competition with mines operated by employees working for wages.

An illustration of how a change in the system of business may affect employees is presented by the cash-and-carry grocery stores which eliminate delivery of goods altogether and thus affect the employment of delivery drivers of other stores who pursue a different method.

When we remember that the officers of appellees' union testify that their principal objection is to the "vendor system" employed by the appellant and that they had no quarrel concerning the employees in appellant's plant, the claim of appellees would require the application of the Anti-Injunction statute to every change of operation of competing producers,

manufacturers or employers, if the effect were to reduce the number of employees, eliminate employees, or to adopt any method that might affect the hiring capacity of their own employers. The history of the labor enactments in this State, and other jurisdictions having similar statutes, indicates the law only applies in cases where the parties to the dispute are either employers hiring labor, or employees hired on a wage basis or its equivalent. Neither the history of labor controversies nor the language of the Anti-Injunction statute nor any other enactment affecting labor, indicates the act was ever intended to apply to cases where the controversy is between the employees who work for wages in performing services, and producers or manufacturers who do not have hired employees, letting that part of the business be performed in an independent manner by contractors, commission men or persons working on a coöperative basis.

To hold the Anti-Injunction statute may be invoked for the purpose of compelling a producer not employing labor to change its system of distribution, by picketing its purchasers and thus destroying its business, would tend to prevent competition and foster monopoly. The right to contract, the right to do business and the right to labor freely and without restraint are all constitutional rights equally sacred, and statutory enactments must be construed, if possible, so as to avoid infringing such rights. There is nothing in the Anti-Injunction statute that prohibits the issuing of an injunction to restrain boycotting or interfering with contract relations, other than employment contracts, or the right to do business generally, and it is not to be presumed that the General Assembly intended such far-reaching results without some mention thereof in the enactment. The same conclusion was reached in *Evening Times Publishing Co.* v. *American Newspaper Guild,* 122 N. J. E. 545, 195 Atl. 378, construing the same kind of statute, and in *Duplex Printing Press Co.* v. *Deering, supra,* in construing the Clayton act upon which the Illinois statute was modelled, in

which it is said "the party to such dispute" is limited to employer and employee. It seems that the words "party to a labor dispute," in the Illinois act, must necessarily receive the same construction.

Considering the plaintiff has certain rights which are not affected by the provisions of the Anti-Injunction act, does the record disclose the defendants have done anything that justifies the relief demanded? The evidence closely analyzed embraces a narrow point. Appellant does not employ men to deliver milk. It sells milk to persons who own or control their own trucks and who dispose of it to certain individuals and stores along a given route. The appellant receives a net amount cash at its own platform and, of course, has a beneficial interest in the quantity that the immediate purchasers sell, as that increases its volume of trade.

The appellees are employees of competing dairies. They work a certain number of hours each day and have a union scale of wages and deliver their products along certain routes, but collect the purchase price of such products for their employers. The delivery of milk by the individual appellees is made as an employee for their employer. The delivery of milk by the so-called vendors is made in their own behalf as independent purchasers. The difference in the legal relationship between the purchasers of milk is that, in the one instance, they are buyers of the dairy, and in the other instance buyers of the individual drivers, and it is around this significant legal relationship the controversy is waged.

In situations comparable to that of the appellant with respect to its ultimate buyers, it has been held repeatedly that an action will lie for a malicious interference with the disposal of plaintiff's labor or capital, or for interfering with lawful contracts, or from bringing about or engaging in a secondary boycott of plaintiff's business or product. The term "malicious," in such instances, does not mean ill-will or hatred, but does mean the doing of the intentional acts

violating such rights without justification. (*Doremus* v. *Hennessy, supra; Anderson* v. *Moskovitz, supra.*) In the latter case the court says: "Malice is proved if it appears that the defendant with knowledge of the contract intentionally and without justification induced one of the contracting parties to break it," and cites the case of *Beakman* v. *Marsters,* 195 Mass. 205, 80 N. E. 817, in which it is said: "No one can legally excuse himself to a man, of whose contract he has procured a breach, on the ground that he acted on a wrong understanding of his own rights, or without malice, or *bona fide,* or in the best interests of himself." Substantially the same thing was said in *Doremus* v. *Hennessy, supra,* at page 615: "An intent to do a wrongful harm and injury is unlawful, and if a wrongful act is done to the detriment of the right of another it is malicious, and an act maliciously done, with the intent and purpose of injuring another, is not lawful competition." The doing of a wrongful act intentionally, without just cause, constitutes malice in a legal sense. (*London Guarantee Co.* v. *Horn,* 206 Ill. 493.) The same principle was applied in *Purington* v. *Hinchliff, supra,* where the court says, at page 166: "No person or combination of persons can legally, by direct or indirect means, obstruct or interfere with another in the conduct of his lawful business, and any loss wilfully caused by such interference will give the party injured a right of action for all damages sustained." And in *Carpenters' Union* v. *Citizens Committee, supra,* the rule was applied in favor of a trade union, the court saying, at page 246: "It is unlawful and actionable for one man from unlawful motives to interfere with another's trade by fraud or misrepresentation, physical or moral intimidation or persuasion, with intent to inflict an injury which causes loss."

Under the evidence in this case there can be no doubt the appellees intentionally interfered with appellant's business. They say they did not have any personal animus toward the appellant, but they objected to the system of

selling milk and instituted the actions by which they hoped to compel the appellant to abandon a system which the appellees thought ·detrimental to their interest. It is true appellees claim their motive was their own welfare, and assert their belief they had a right to so proceed, but, as pointed out above, the motive with which the act is done is immaterial provided it is illegal. It is not disputed that the acts were knowingly done and as pointed out above, were illegal, and consequently they are brought within the rules stated above. We believe this principle is not in any way affected by decisions under the Anti-Injunction act or decisions affecting rights of employees in legitimate disputes concerning employment under the law of Illinois. The system of selling milk of the appellant is a species of competition with the unionized dairies in the Chicago district. The appellant enjoys a large distribution because of the lower price charged by its vendors for the product sold and delivered. This right is of value to the appellant and is of value to milk purchasers, and the fact that it has a tendency to injure the appellees by depriving them of customers is a result of legitimate competition that is favored by the law. If this competition were stifled by permitting the interference with contracts or purchases by independent purchasers or ultimate consumers going and procuring their own delivery, it would tend to create a monopoly not only in the companies presently engaged in the delivery of milk, but would stifle competition on the part of the appellant and others who might desire to engage in the business and use a system of delivery different from that of the appellees. "Competition, however, does not include all conflicts of temporal interest, and does not apply in the case of the efforts of a stranger to a controversy between employers and employees in regard to their business relations, to compel the action of either or to injure either for the purpose of compelling him to yield to the other the absolute legal

right to manage his own business in his own way." *Carpenters' Union* v. *Citizens Committee, supra.*

We have, to this point, considered the legal propositions involved upon the facts admitted by the appellees. The facts in the record present a situation stronger than the mere claim of self-protection on the part of the appellees, and the carrying out of peaceful measures to enforce such alleged rights.

The master in chancery made a finding as follows: "That the said defendant Milk Wagon Drivers' Union, Local 753, its officers and members, acting in their several capacities as officers, agents and members of said Union, did enter into an unlawful conspiracy to prevent the sale and delivery of milk from plaintiff's dairy; that such interference with plaintiff's business consisted of intimidation of the customers of plaintiff's vendors, by the commission of the acts of violence heretofore enumerated; that it was part of said conspiracy and activities of said defendants to hinder the storekeepers and other retailers of milk sold by the plaintiff; to prevent them from continuing the business of selling milk of the plaintiff and to cause the customers of the plaintiff's vendors to discontinue the purchase of plaintiff's milk."

The evidence shows that, in addition to picketing the stores handling appellant's milk by men carrying banners bearing the words "unfair to Milk Wagon Drivers' Union," etc., numerous instances of assaults upon the independent vendors occurred; that trucks hauling milk were overturned and damaged; that windows of the stores were broken and stink bombs and explosives thrown in or upon the stores of the distributors of appellant's milk. In several instances it is shown these unlawful acts were committed by members of defendant union, but it is claimed that these were their personal acts, and not the act of the union or done with the authority of the union. The evidence, however, further discloses that when any of these law breakers were appre-

hended they were represented by an attorney of the union, their fines were paid out of union funds and damages were paid for destruction of property in like manner, and there is nothing in the record to indicate that any of these offenders were disciplined in any manner by the defendant union. There is some authority for the proposition that such conduct constitutes a ratification by the union of such illegal acts. (*Alaska S. S. Co.* v. *International Longshoremen's Ass'n,* 236 Fed. 964; *Great Northern Railway Co.* v. *Local Lodge,* 283 id. 557.) Whether it does or not, picketing by the carrying of a banner, with the words, "unfair," etc., printed thereon, in connection with or following a series of assaults or destruction of property, could not help but have the effect of intimidating the persons in front of whose premises such picketing occurred and of causing them to believe that non-compliance would possibly be followed by acts of an unlawful character. Certainly it is not within the power of the retailers to prevent unlawful acts and if the defendant union puts in motion a policy which its members deem to be an invitation or license to injure persons and property, it cannot, in equity, claim that there can be a severance of the lawful acts from the unlawful ones, and thus, by disclaiming an illegal purpose, take advantage of illegal acts.

It is claimed that these several acts constitute a crime under the statute (Ill. Rev. Stat. 1937, chap. 38, par. 139) but it is unnecessary to determine this proposition because it is well-settled that the fact that a threatened invasion of a person's rights, if accomplished, will constitute a criminal offense, is no bar to relief by an injunction to which such person would otherwise be entitled. *Carpenters' Union* v. *Citizens Committee, supra; Campbell* v. *Motion Picture Co.* 151 Minn. 220, 186 N. W. 781; *In re Debs,* 158 U. S. 564, 39 L. ed. 1092; *Parkinson* v. *Building Trades Council,* 154 Cal. 581, 21 L. R. A. (N. S.) 550; *Harvey* v. *Chapman,* 226 Mass. 191, 19 L. R. A. (1917 E.) 389; *Auburn Dray-*

*ing Co.* v. *Wardell,* 227 N. Y. 1, 124 N. E. 97; *Wilson* v. *Hey, supra; Duplex Printing Press Co.* v. *Deering, supra.*

The bill of complaint in this case alleges irreparable injury and multiplicity of suits and threats of continued invasions of appellant's property rights, justifying the issuance of an injunction. Among the numerous authorities on this question no distinction seems to be made in the right to an injunction in cases involving a secondary boycott and other species of invasion of appellant's rights to be free from interference, as pointed out above, so that it becomes unnecessary to determine whether the acts complained of constitute a secondary boycott or whether they are simply illegal acts which justify the injunctive process to protect the appellant's rights.

Appellees have called to the court's attention a number of authorities which, in view of our conclusion that a labor dispute is not involved, have no relevancy here. As supporting the proposition that peaceful picketing is legal and lawful, every case cited on the proposition grew out of a case between an employer and employee, or involved employees' rights against other employers of labor. None of the cases cited by appellees applies to cases of conspiracy to injure another's business or trade or to induce a breach of a contract to the injury of a third person, or to boycott cases where the plaintiff is attacked through pressure upon his customers, except those cases under the Norris-LaGuardia act, or under statutes peculiar to those States in which the controversy arose. It will be noted that the term "labor dispute," as used in the Norris-LaGuardia act, is much broader and more far-reaching than as used in the Anti-Injunction act. Among other things it contains the following provision: "The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiations, fixing, maintaining, changing, seeking to arrange terms or conditions of employment, regardless of

whether or not the disputants stand in the proximate relation of employer and employee."

*Senn* v. *Tile Layers' Union*, 301 U. S. 468, and *American Furniture Co.* v. *I. B. of T. and H. of A.* 222 Wis. 338, both involve a statute of Wisconsin similar to the Norris-LaGuardia act, as, also, does *Wallace* v. *International Ass'n of Mechanics*, 155 Ore. 652, 63 Pac. (2) 1090, a similar statute in Oregon.

*Lauf* v. *Shinner Co.* 303 U. S. 323, *New Negro Alliance* v. *Sanitary Grocery*, id. 552, *Diamond Full Fashioned Hosiery Co.* v. *Leader*, 20 Fed. Sup. 467, and *Levering & Garrigues Co.* v. *Morrin*, 71 Fed. (2d) 284, are all cases arising under the Norris-LaGuardia act. It is urged that *Fenske Bros.* v. *Upholsterers Union, supra,* sustains the contention of appellees. That case involved a controversy between employer and employee and was, therefore, properly within the terms of the Anti-Injunction act to escape the effect of which it was claimed said act was invalid. This contention was rejected by the court and the authorities pertaining to the rights of employers and employees reviewed in a comprehensive manner and, far from being an authority sustaining the claims of appellees in this case, it either directly, or by plain inference, excluded from its effect boycotts and other unlawful actions, saying, at page 258: "It is not to be presumed that the Legislature contemplated legalizing peaceable persuasion in furtherance of any unlawful strike or *actionable conspiracy,* because by the same token the peaceable acts would become unlawful."

Appellees contend that they may not be restrained or enjoined in any case from carrying placards bearing thereon printed words conveying information to the public, because such would violate the guarantee of free speech. In this connection they call our attention to a number of cases which it is claimed sustain their position in this case. *DeJongs* v. *Oregon*, 299 U. S. 353, 81 L. ed. 278, involved a direct suppression of public meetings and discussions under

the Criminal Syndicalism statute of Oregon. *Lovell* v. *Griffin*, 303 U. S. 444, 82 L. ed. 949, involved the legality of an ordinance prohibiting the distribution of circulars and books inside of a city, without a permit. *Grosjean* v. *American Press Co.* 297 U. S. 233, 80 L. ed. 660, concerned the imposing of a license tax on gross receipts for the privilege of engaging in the business of printing or publishing, and *Near* v. *Minnesota*, 283 U. S. 697, 75 L. ed. 1357, determined the right of the State to suppress a newspaper by declaring it a public nuisance if it published libelous or scandalous matter either against individuals or public officers. All of these cases involved legislation attempting to suppress or limit free speech by criminal process or by way of injunction. They did not involve the construction to be given in case of conflicting constitutional rights. As was pointed out above, the appellant has certain rights guaranteed by the constitution and appellees claim that, regardless of those rights, they may do certain acts by reason of a different provision of the constitution. In this respect none of the above cases applies. No case has been cited where this claim by appellees has been applied in boycott cases, or cases involving the breach of constitutional rights, except in those States where boycotts are not illegal and where statutes similar to the Norris-LaGuardia act have been enacted.

The right to acquire and protect property is an inherent right not given but declared by the constitution. The privilege of free speech cannot be used to the exclusion of other constitutional rights nor as an excuse for unlawful activities.

In *Aikens* v. *Wisconsin*, 195 U. S. 193, 49 L. ed. 154, Mr. Justice Holmes, in commenting upon a situation involving conflicting claims under the constitution, said: "When the acts consist of making a combination calculated to cause temporal damage, the power to punish such acts when done maliciously, cannot be denied because they are to be followed and worked out by conduct which might have been

lawful if not preceded by the acts. No conduct has such an absolute privilege as to justify all possible schemes of which it may be a part. The most innocent and constitutionally protected of acts or omissions may be made a step in a criminal plot and if it is a step in a plot, neither its innocence nor the constitution is sufficient to prevent the punishment of the plot by law."

In *Gompers* v. *Buck's Stove and Range Co.* 221 U. S. 418, 55 L. ed. 797, the United States Supreme Court held that a court of equity may enjoin continuance of a boycott, although spoken words or written matter were used as one of the instrumentalities by which the boycott was made effective. On page 439 the court says: "In case of an unlawful conspiracy, the agreement to act in concert when the signal is published gives the words 'unfair * * *' or similar expressions, a force not inhering in the words themselves and therefore exceeding any possible right of speech which a single individual might have. Under such circumstances they become what have been called 'verbal acts' and as much subject to injunction as the use of any other force whereby property is unlawfully damaged. When the facts in such cases warrant it, a court having jurisdiction of the parties and subject matter has power to grant an injunction."

In *Truax* v. *Corrigan, supra,* involving a labor dispute, a claim was made by the defendants that they had the right to picket by displaying banners advertising a strike and denouncing the plaintiff, as a means of advertising the cause of the strike. This claim was rejected by the court.

In *Near* v. *Minnesota, supra,* where the right of the State to suppress a newspaper, under certain conditions, as a nuisance, was rejected, the court approved the case of *Gompers* v. *Buck's Stove and Range Co. supra,* saying: "The constitutional guarantee of free speech does not protect a man from an injunction against uttering words that may have all the effect of force."

In *Hitchman Coal and Coke Co.* v. *Mitchell, supra,* the question was presented of a conflict between the rights of a union to organize and the right of a property owner to be free from interference in his right to do business, and the relative rights of the parties in case of a conflict. The court, in commenting, says: "The cardinal error of defendant's position lies in the assumption that the right is so absolute that it may be exercised under any circumstances and without any qualification; whereas in truth, like other rights that exist in civilized society, it must always be exercised with reasonable regard for the conflicting rights of others. [Citations.] The familiar maxim * * * literally translated 'so use your own property as not to injure that of another person' but, by more proper interpretation, 'so as not to injure the rights of another'—applies to conflicting rights of every description."

The principle underlying these distinctions has not been overruled, and in the case of *Senn* v. *Tile Layers' Protective Union, supra,* in upholding a Wisconsin act similar to the Norris-LaGuardia act, the court says: "The statute provides that the picketing must be peaceful; and that term as used implies not only absence of violence, but the absence of any unlawful act. It precludes the intimidation of customers. It precludes any form of physical obstruction or interference with the plaintiff's business. It authorizes giving publicity to the existence of the dispute 'either by advertising, patrolling any public streets or places where any person or persons may lawfully be;' but precludes misrepresentation of the facts of the controversy. And it declares that 'nothing herein shall be construed to legalize secondary boycott.' " It is clear from this language the court was limiting its views to the particular statute under consideration and indicating, in the clearest language, that the privilege of picketing, even where peaceful, did not extend to cases where unlawful acts were committed or intended to be used for the purpose of legalizing secondary boycotts. Many

other cases on both sides are cited, but in view of the decisions of this court condemning boycotts and prohibiting the interference with constitutional rights, pointed out herein, the acts of the appellees, in combining, as an aggregation of individuals, to picket in the manner described and found by the master, were unlawful acts and justified the issuance of a permanent injunction as prayed.

The judgment. of the superior court is reversed and the cause is remanded, with directions to enter a permanent injunction as prayed in the bill of complaint.

*Reversed and remanded, with directions.*

Mr. Justice Farthing, dissenting.