Twin City Barge & Towing Co., a Corporation, Plaintiff-Appellee, v. Licensed Tugmen's and Pilots' Protective Association of America, an Unincorporated Association, Patrick J. Cullnan, Jr., et al., Defendants-Appellants.

Gen. No. 49,093.

First District, First Division.

March 30, 1964.

Lester Asher, Joseph E. Gubbins, Melvin L. Rosenbloom, and Irving M. Friedman, all of Chicago (Asher, Gubbins and Segall, Katz and Friedman, of counsel), for appellants.

Stephen A. Milwid and Warren C. Ingersoll, of Chicago (Lord, Bissell & Brook, of counsel), for appellee.

MR. JUSTICE BURMAN delivered the opinion of the court.

This is an interlocutory appeal from a Superior Court order granting a temporary injunction upon the Master's recommendation restraining Licensed Tugmen's and Pilots' Protective Association of America, an unincorporated association, Patrick J. Cullnan, Jr., and Jerry Williams, defendants, from any manner of picketing or inducing the picketing of plaintiff's customers or the latter's customers or plaintiff's vessels, barges, towboats, and from threatening or coercing persons, firms or corporations from doing

business with the plaintiff or with plaintiff's customers.

For the purposes of this appeal no issue was made by Tugmen's concerning any findings of fact made by the Master in Chancery or by the court. It is Tugmen's theory that assuming the actual facts to be as found by the Master, the complaint should have been dismissed because the Superior Court lacked jurisdiction over the subject matter and the complaint failed to state an actionable cause.

Prior to July of 1961, Twin City operated a small harbor towing company in the Minneapolis-St. Paul, Minnesota areas. In July of 1961, Twin City purchased from Chicago Towing Company, some of their equipment, to wit: 2 tugboats, 3 liquid tank barges and certain spare parts that went with the equipment. They did not purchase other assets from Chicago Towing nor its stock, nor did any stockholder of Chicago Towing acquire stock in Twin City. Upon the consummation of the sale, Chicago Towing discharged its personnel and went out of business. The officers, captains and engineers who formerly manned the equipment of Chicago Towing, were members of Tugmen's, and had entered into collective bargaining agreements with them covering their wages, hours and other conditions of employment. Twin City entered the Chicago Area for the first time after purchasing Chicago Towing and operated the vessels with crews who were members of the International Order of Masters, Mates and Pilots, Local 28 and the National Maintenance Union. The present dispute began when Twin City discontinued employing captains and engineers who were members of Tugmen's as officers on its tugboats. In its other operations, Twin City maintained collective bargaining agreements covering its officer personnel with unions other than Tugmen's,

3

and it extended application of these agreements to its new operations in Chicago.

Tugmen's first contends that a State Court has no jurisdiction to act upon a subject within the regulatory scope of the Labor-Management Relations Act of 1947, as amended, regardless of the fact that the action is grounded on alleged tort. The defense, that of a lack of jurisdiction in the trial court due to Federal preemption in the field, raises problems of an admittedly "Delphic nature" (Machinists v. Gonzales, 356 US 617). We will first review the facts which brought this controversy before us.

The essential facts are not in dispute. The controversy between the parties began shortly after Twin City commenced operations in Chicago. The actions of the defendant association and the other named defendants consisted, in the main, of contacting and threatening or coercing not only Twin City and its customers, but those with whom its customers did business as well as its bank upon whom it relied for financial support. They were warned of "labor trouble" or given outright threats of picketing at their places of business if they did not cease using the services of Twin City or permitted Twin City's barges to tie up at their terminals. On occasion barges belonging to Twin City were subject to picketing and as a consequence were not unloaded. These facts will be set out in greater detail later in the opinion.

In August, 1961, Twin City filed charges with the National Labor Relations Board alleging that the foregoing conduct engaged in by Tugmen's constituted an unfair labor practice under the Act and requested relief. On October 23, 1961, the Regional Director of the N.L.R.B. issued a complaint against the Tugmen's setting forth that the activities of the Tugmen's such as picketing and the conversations between Tugmen's representatives and the customers of Twin City, constituted violations of the Act. Thereafter, a hearing

4

was held before a trial examiner of the N.L.R.B. who issued his Intermediate Report in which he found that the operations of Twin City and the customers of Twin City involved in the allegations of the complaint were enterprises engaged in interstate commerce within the jurisdiction of the N.L.R.B. However, the examiner, in addition, found that since the evidence showed that Tugmen's membership was comprised of persons who were supervisors, the General Counsel had "failed to prove that the Tugmen's is a labor organization within the meaning of the act." He thus recommended that the complaint be dismissed and under those circumstances did "not find it necessary to discuss the alleged unfair labor practices." Twin City and the General Counsel of the N.L.R.B. appealed the recommended order of the trial examiner to the Board itself, and on August 22, 1962, the N.L.R.B. adopted the findings, conclusions and recommendations of the trial examiner and issued the order dismissing the complaint.

When the proceedings commenced before the Board, Tugmen's entered into a stipulation to refrain from further acts against Twin City. Shortly after the complaint was dismissed Tugmen's again commenced the activities complained of and Twin City filed the instant complaint in the Superior Court.

The cause came on to be heard before Judge Lupe who referred the matter to Master Seymour S. Price for the taking of testimony and the preparation of a preliminary report. Master Price found from the evidence that the above conduct of defendants had as its object:

> "to prevent, by one method or another, plaintiff's customers, actual or prospective, who had no labor dispute with defendant union, from engaging the services of the plaintiff company; that from the evidence presented, there was coercion

5

. . . , although no actual physical threats or violence . . ."

and that,

"a continuation of the acts complained of . . . could cause an irreparable injury to the plaintiff company."

Judge Lupe at a hearing held on January 11, 1963, approved and confirmed the findings of the Master and ordered that a writ of injunction be issued. This appeal is taken from that temporary injunction decree.

■ It is true, as Tugmen's points out, that when the exercise of state power over a particular area of activity has threatened interference with a clearly indicated policy of industrial relations, the Supreme Court in numerous decisions has precluded the state courts from acting. Guss v. Utah Labor Relations Board, 353 US 1; Youngdahl v. Rainfair, Inc., 355 US 131; Teamsters Union v. New York, N. H. & H. R. Co., 350 US 155; Garner v. Teamsters Union, 346 US 485. But in Weber v. Anheuser-Busch, Inc., 348 US 468, the Court said:

By the Taft-Hartley Act, Congress did not exhaust the full sweep of legislative power over industrial relations given by the Commerce Clause. Congress formulated a code whereby it outlawed some aspects of labor activities and left others free for the operation of economic forces. As to both categories, the areas that have been pre-empted by federal authority and thereby withdrawn from state power are not susceptible of delimitation by fixed metes and bounds. Obvious conflict, actual or potential, leads to easy judicial exclusion of state action. Such was the situation in Garner v. Teamsters Union, supra. But as the opinion in that case recalled, the Labor-Man-

6

agement Relations Act "leaves much to the states, though Congress has refrained from telling us how much." 346 US at 488. This penumbral area can be rendered progressively clear only by the course of litigation. (480–481)

This section from the Weber opinion upholding a residuum of rights in the states is interestingly enough quoted in the decision of the Supreme Court upon which the Tugmen's most seriously rely; San Diego Unions v. Garmon, 359 US 236. In that case the court while recognizing that preemption was not a totally engulfing process nevertheless gave to the doctrine its broadest exposition. The Court held that where the facts of a case reveal a situation which is "arguably subject" or "reasonably within" any protected or prohibited activity under the National Labor Relations Act, state and federal courts are preempted from exercising jurisdiction over the dispute unless the N.L.R.B. makes a clear determination that the "activity is neither protected nor prohibited." Only such a rule, the court said, will preserve for the Labor Board its congressionally delegated function of deciding what is and what is not within its domain. Although it is clear that Garmon sets forth a broad statement of the principles of preemption and the actions which courts must follow in applying those principles, we do not feel that these concepts are conclusive in the case at bar.

In Marine Engineers v. Interlake Co., 370 US 173, the Supreme Court in some ways extended the Garmon doctrine of initial preemption to an extreme degree yet on the other hand it more clearly elucidated the point at which "arguable" federal exclusiveness ends and state jurisdictional power begins. In that case the court in reversing a decision of the Minnesota Supreme Court held that "The task of determining what is a 'labor organization' in the context of § 8(b) must in any doubtful case begin with the National

Labor Relations Board, and that the only workable way to assure this result is for the courts to concede that a union is a 'labor organization' for § 8(b) purposes whenever a reasonably arguable case is made to that effect." The effect of the court's decision was to extend the Garmon doctrine of initial N.L.R.B. preemption in "arguable" cases not only to the issue of unfair labor practices, but to all boundaries which delimit N.L.R.B. jurisdiction, e. g. the question of whether a particular party was a "labor organization."

■■ Seemingly in return for this extension of the Garmon test and thus of Federal preemption itself, the Court discussed the situation under which a state court might acquire jurisdiction. The Court said:

This was a case, therefore, where a state court was shown not simply the arguable possibility of Labor Board jurisdiction over the controversy before it, but that the Board had actually determined the underlying issue upon which its jurisdiction depended. i. e., that MEBA was a "labor organization" for purposes of § 8(b) of the Act. In an absence of a showing that this position had been authoritatively rejected by the courts, *Or Abandoned By The Labor Board Itself,* we hold that it was the duty of the state court to defer to the Board's determination. 370 US at 184. (Emphasis added.)

The Court appears to be saying that in a case where the issue of whether or not one of the parties is a "labor organization" has been settled by the N.L.R.B., that determination shall be controlling. If the Board has determined that the party is a "labor organization" then the state courts are conclusively preempted; this was the situation in Marine Engineers. If, however, the decision of the Board is that the party is not a "labor organizaton" then it would ap-

pear that the issue is no longer "arguable" and the state courts may entertain the matter free of fear that they tread on federally preempted ground. We feel that such is the case here. Twin City conformed to the ruling in Marine Engineers and first filed its complaint before the Board. The posture of the dispute as it reached us, makes it clear that not only is Tugmen's not "arguably" subject to the Act, but rather the decision of the N.L.R.B. itself has shown that it is manifestly without the scope of the federal legislation.

Tugmen's however, contends, that even if it was not found to be a "labor organization" by the N.L.R.B. that the interests of a "single, uniform, national rule" governing labor relations in interstate commerce require that the state courts remain totally powerless to act in the field. It argues that the jurisdiction of the N.L.R.B. depends solely upon the interstate character of the "employer's business" and that the fact that Tugmen's is not a "labor organization" does not deprive the N.L.R.B. of exclusive jurisdiction. Such an argument is contradicted by the language of the Taft-Hartley Act itself and by the decision of the trial examiner that since Tugmen's was not a "labor organization" he need not consider the merits of the case. In addition, critical writings point out that the presence of a "labor organization" is a prerequisite to N.L.R.B. jurisdiction. (See Illinois Labor Law, Barnett Hodes pp 6–7 and 61 Michigan LR 994–995.)

Tugmen's argues in the conclusion of its brief that:

The Federal Government alone, through Congress is empowered to regulate interstate commerce. Congress has regulated the conduct attributed to the Tugmen in the enactment of the Act. Even if, however, Congress had abandoned or never exercised its powers to regulate the activities involved herein as they affect interstate commerce,

the States would not succeed to the power to so regulate.

Mr. Rosenbloom, counsel for Tugmen's, admitted in the hearing before Master Price that, "I think they are without a remedy." Tugmen's thus maintains that it exists in a no-man's-land free from state interference while excluded from Federal legislative scope. The creation of one no-man's-land by judicial decision (Guss v. Utah Labor Relations Board, 353 US 1) has already resulted in voluminous critical literature * and the passage of Federal legislation (sec 14–C–I of the Taft-Hartley Act (1959)). We do not feel compelled either by the precedents or by common sense to affirm the presence of another such area of doubt.

 The defendants next contend that the conduct of Tugmen's was not accompanied by violence of any kind and that in the absence of such acts no injunction can be granted. Basically, the position upon which the defendants rely was stated by the Court in Cielesz v. Local 189, Amalgamated Meat Cutters, Etc., 25 Ill App2d 491, 497, 167 NE2d 302:

> [A]n injunction will not be granted against peaceable picketing for a lawful purpose. The element of purpose for which the picketing is being conducted must be taken into consideration to ascertain whether it is in furtherance of a lawful purpose and not contrary to some statute or public policy. ILP, Labor Relations, sec 75. Each case must be decided upon its own particular facts and circumstances.

---

* Law Review articles on the Guss case include the following:

| | |
|---|---|
| 43 ABAJ 541 | 56 Mich L Rev 133 |
| 45 Calif L Rev 216 | 1957 U Ill LF 145 |
| 43 Cornell LQ 308 | 43 Va L Rev 733 |
| 71 Harv L Rev 179 | |

Tugmen's protestation of "peaceful picketing" appears to be contradicted by the Master who found from the uncontroverted evidence that the defendants engaged in unlawful, coercive and injurious conduct against the plaintiff and others doing business with them. These findings of fact were adopted by the Chancellor. The evidence shows that Tugmen's and its agents participated in a concerted effort to coerce and intimidate the customers and business associates of Twin City; this effort being carried on by telephone calls, private meetings and picketing, both by land and sea. In at least two instances defendants approached customers of Twin City and informed them that if they continued to use Twin City's services that they would "reluctantly" be forced to place pickets at their places of business. In both instances these former accounts of Twin City sought towing services elsewhere. In two other cases calls were made to customers of Twin City and suggestions made that if plaintiff's employment was continued, "labor difficulties" could occur. Defendant Cullman also contacted the president of the Pullman Bank and Trust Company where Twin City had an account and had in addition procured a loan. Shortly thereafter pickets appeared in front of the Bank with signs reading: "This Bank loaned money to an out-of-town company and cost me my job." The pickets admitted to being members of Tugmen's, but said that they had conceived of picketing the Bank as their own idea. As was mentioned above, picketing in this case was not confined to demonstrations on the land, but rather at numerous times throughout the trial record mention is made of the cabin cruiser displaying signs and placards of the Tugmen's Union which appears alongside independently owned dockets whenever there is the slightest hint of a Twin City barge in the area.

11

The picketing and the other actions which occurred here are both a means of communication and a means of economic coercion. Viewed as communication, they are protected against state interference by the constitutional guarantees of freedom of speech; viewed as a means of economic coercion, such actions are subject to police regulations as is any other factor influencing the common good. Mr. Justice Frankfurter writing for the Court in Teamsters Union v. Hanke, 339 US 470, 474 said:

> Here, as in Hughes v. Superior Court, ante, p 460, we must start with the fact that while picketing has an ingredient of communication it cannot be dogmatically equated with the constitutionally protected freedom of speech. Our decisions reflect recognition that picketing is "indeed a hybrid." Freund, On Understanding the Supreme Court 18 (1949) . . . The effort in the cases has been to strike a balance between the constitutional protection of the element of communication in picketing and "the power of the State to set the limits of permissible contest open to industrial combatants." Thornhill v. Alabama, 310 US 88, 104. A State's judgment on striking such a balance is of course subject to the limitations of the Fourteenth Amendment. Embracing as such a judgment does, however, a State's social and economic policies, which in turn depend on knowledge and appraisal of local social and economic factors, such judgment on these matters comes to this Court being a weighty title of respect.

And in Hughes v. Superior Court, 339 US 460 at 468 the Court said:

> The policy of a State may rely for the common good on the free play of conflicting interests and leave conduct unregulated. Contrawise, a State

12

may deem it wiser policy to regulate. Regulation may take the form of legislation, e. g., restraint of trade statutes, or be left to the ad hoc judicial process, e. g., common law mode of dealing with restraints of trade. Either method may outlaw an end not in the public interest or merely address itself to the obvious means toward such end. The form the regulation should take and its scope are surely matters of policy and, as such, within a State's choice.

Turning to the attitudes which have been expressed by the Illinois Courts in relation to the facts of this case, the words of the court in Dinoffria v. International Brotherhood of Teamsters Union, 331 Ill App 129, 72 NE2d 635 would appear to state the applicable law:

> Courts have invariably enjoined violence, or even peaceful picketing when it is enmeshed in the context of violence, Meadowmoor Dairies, Inc. v. Milk Wagon Drivers' Union of Chicago, Local 753, 312 US 287. Moreover, even when there was no violence in the sense of physical assault or destruction of property, statements and actions of a threatening nature, which amounted to attempts to intimidate, will also be enjoined, Ellingsen v. Milk Wagon Drivers' Union, Local No. 753, 377 Ill 76, 86 and such threats and intimidation have been implied from conduct and demeanor as well as from spoken words.
>
> Courts have likewise enjoined the use of the secondary boycott, which is a combination to coerce customers, actual or prospective, to discontinue dealings, or withhold their patronage, through fear of loss or damage to themselves. Meadowmoor case, supra, 371 Ill 377 at p 381; Anderson & Lind Mfg. Co. v. Carpenters' Dist.

13

Council, 308 Ill 488; Duplex Printing Press Co. v. Deering, 254 US 443; Auburn Draying Co. v. Wardell, 227 NY 1. Such coercion has been held to exist where the union has instilled fear of loss or injury to business unless one submits to demands, as well as where there is fear of violence to the person. Anderson & Lind Mfg. Co. case, supra. (137)

Although it may be true as Tugmen's contends that the rule laid down by the United States Supreme Court in the case of A. F. of L. v. Swing, 312 US 321 acts to extend the provisions of the Illinois Anti-Labor Injunction Act (Ill Rev Stats, c 48, § 2(a) (1961)) to situations where there is not an employer-employee relationship, yet such a constitutionally mandated expansion of the act would apply solely to situations where the only weapon used by the union was the communicative act of picketing. In our case Tugmen's has chosen to make use of a more potent arsenal. It is not required that a plaintiff seeking a temporary injunction make out a case that is certain to prevail on final hearing, it is enough if there is shown a fair question as to the existence of the rights claimed, so that the court is satisfied their present state should be preserved until final hearing and disposition. Western Auto Supply Co. v. Chalcraft, 16 Ill App2d 461, 464, 148 NE2d 592; O'Brien v. Matual, 14 Ill App2d 173, 186, 188, 144 NE2d 446.

The order of the Superior Court granting the temporary injunction is affirmed.

Affirmed.

MURPHY, P. J. and KLUCZYNSKI, J., concur.