DUGAN OIL COMPANY, INC., Plaintiff-Appellee, *v.* COALITION OF AREA LABOR, Defendant-Appellant.—PATTERSON BROTHERS OIL AND GAS, INC., *et al.*, Plaintiffs-Appellees, *v.* H. BRENT DeLAND *et al.*, Defendants-Appellants.—GEORGE ANDERSON *et al.*, Plaintiffs-Appellees, *v.* H. BRENT DeLAND *et al.*, Defendants-Appellants.—PATTERSON BROTHERS OIL AND GAS, INC., *et al.*, Plaintiffs-Appellees, *v.* H. BRENT DeLAND *et al.*, Defendants-Appellants.

Fourth District   Nos. 17010, 17035, 17042, 17043 cons.

Opinion filed July 14, 1981.

David J. Letvin, Robert W. Dziubla, and Harvey Grossman, of the Roger Baldwin Foundation, all of Chicago (Rosenthal & Schanfield, of counsel), for appellants.

Brown, Hay & Stephens, of Springfield (Edward J. Cunningham and Jeffery M. Wilday, of counsel), for appellees Patterson Brothers Oil and Gas, Inc., *et al.*

Law Offices of James P. Baker, of Springfield (James P. Baker, of counsel), for appellee Dugan Oil Company, Inc.

Mr. PRESIDING JUSTICE SCOTT delivered the opinion of the court:

The above captioned cases were consolidated for oral argument and opinion. The appellant, Coalition of Area Labor, an unincorporated association, and other defendants-appellants, are appealing from the issuance of preliminary injunctions in the cases in question. The factual situations which resulted in these appeals are substantially the same and had their inception on July 28, 1980. On this date the city of Springfield

enacted an ordinance authorizing the execution of a contract between Shell Oil Company and the city for the purchase of coal. Pursuant to such authority, the city entered into a contract to purchase 32.05 million tons of coal which is to be mined from a mine owned by Shell and which is to be constructed at Elkhart in Logan County.

Shell, through a subsidiary, engaged the services of Dincon Construction Company, a South Carolina concern, to build the mine. Dincon employed nonunion labor from the south rather than union labor from the Springfield area. A community coalition including labor groups, college professors, government employees, and other local citizens from the Springfield area coalesced into a loosely knit and unstructured organization known as "The Coalition of Area Labor" (C.O.A.L.). The organization's purpose is to influence and convince local governmental officials and Shell that workers from outside the Springfield area labor market should not be used to construct the coal mine in Elkhart. That such was the purpose and intent of C.O.A.L. is undisputed. Defendant, H. Brent DeLand, who as much or possibly more than anyone was in a position of leadership with C.O.A.L. and served as its spokesman, met with the press and approximately 100 pickets on January 9, 1981, at which time he stated:

> "We have attempted, without avail, to meet with Shell Oil and its subsidiary companies to resolve our concerns about the use of non-union, non-local labor at the company's new Logan County mine. * * * It is sad that we must invoke this boycott which will undoubtedly harm the local businessmen operating Shell stations."

Like sentiments were expressed in correspondence to the Springfield city council which was signed by DeLand and Harold Sebring, who in addition to being involved in C.O.A.L., is also a business agent for a local labor union in Springfield and president of the Springfield Building and Construction Trades Council.

We will first direct our attention to the above captioned case No. 17043. The plaintiffs in this case are 10 businessmen operating service stations in Springfield. They are not agents or employees of Shell Oil Company; however, 90% of all products sold bear the Shell Oil brand name. The plaintiffs purchase gasoline from Shell at a fixed price, then set and determine the prices at which it is to be sold to the public. The plaintiffs employ a number of individuals, they determine who shall be hired, the work schedules, and the pay that each employee shall receive.

In support of this complaint for a temporary restraining order, affidavits were filed by the plaintiffs in which, in substance, it was averred that commencing on January 9, 1981, and continuing on each Friday, Saturday and Sunday thereafter, the service stations operated by the plaintiffs were picketed by individuals wearing vests or carrying signs

which identified themselves as members of C.O.A.L. and requesting a boycott of Shell Oil Company; that the initial picketing began with 100 picketers surrounding the station of plaintiff Dietrich; that thereafter at the various stations involved the picketers stood in driveways, blocked entryways, took down license plate numbers, photographed customers, and that abusive and obscene language was directed towards customers.

Mr. DeLand and Gregory Powell testified for C.O.A.L. It was Powell's testimony that he was treasurer of the organization's records, that there was no president; it was an unincorporated organization having no by-laws or written documents. He specifically testified that "our purpose was solely to see that union labor was employed in the Elkhart mine."

DeLand's testimony is significant in that it describes the structure or lack of structure of C.O.A.L. as well as the lack of guidance or control that anyone has over the organization's activities. A portion of DeLand's testimony is as follows:

"THE COURT: You are one of the Chairpersons in charge of the picketing?

THE WITNESS: A. Well yes, in charge of C.O.A.L., yes, sir.

THE COURT: If you were to suggest to the picketers that they cease their operations, would they do it?

THE WITNESS: A. They would beat me.

THE COURT: Then you don't control the organization?

THE WITNESS: A. That's correct.

THE COURT: Is it your organization?

THE WITNESS: A. No, sir.

THE COURT: Whose organization is it?

THE WITNESS: A. Well, it's an organization that has become it's own, I mean it's there, but it's not controlled by anybody.

THE COURT: Who's paying dues?

THE WITNESS: A. There's no dues.

THE COURT: Where's the money coming from?

THE WITNESS: There are contributions.

THE COURT: Would you like to get out of the organization now so they won't beat you up?

THE WITNESS: —uh—I would rather not answer that kind of question.

* * *

THE COURT: You mentioned picket captains, who is designated picket captain?

THE WITNESS: A. They were just volunteers who said that they would be willing to be present every week, but that system has failed.

THE COURT: You don't have a list of the picket captains?

THE WITNESS: A. No, because they showed up, often times, one or two weeks, but didn't continue to come back."

The briefs of the parties filed in this appeal clearly reflect that there is no serious disagreement as to the fact that the plaintiffs suffered irreparable injury and harm as the result of the picketing and boycotting.

On February 13, 1981, the circuit court of Sangamon County ruled that instead of ordering the issuance of a restraining order a preliminary injunction would issue. The injunction precluded the defendants from performing the following activities:

"1. Picketing within 300 feet of any parcel of real estate upon which the Petitioners operate a business establishment selling petroleum products at retail and services to members of the general public, and from blocking any and all ingress and egress to any such retail establishment.

2. Picketing any business establishment of Petitioners by more than two picketers, said picketers to be at no time within a distance of 300 feet of any parcel of real estate upon which Petitioners operate their businesses selling petroleum products at retail.

3. Distributing handbills, leaflets, brochures or other memoranda which reasonably tends [sic] to discourage members of the general public from purchasing the products and services and merchandise generally offered for sale by the Petitioners within 300 feet of any parcel of real estate upon which the Petitioners operate a business establishment selling petroleum products at retail to members of the public."

Case No. 17035 was next filed in the circuit court of Sangamon County. Service stations selling gasoline under the Shell brand name were involved and were located in the communities of Riverton and Williamsville. It was stipulated that the parties would testify in accordance with their affidavits and that the testimony of the prior case would be admitted into evidence. The affidavits and evidence established that picketing had occurred which was similar or identical to that in the preceding case (Case No. 17043). A preliminary injunction similar to the one in the prior case was then issued by the trial court.

Case No. 17042 was filed in Logan County. Affidavits and photographs were considered by the trial court which established evidence of picketing substantially similar to that in the Sangamon County cases. A temporary restraining order was issued, and subsequently a preliminary injunction was issued. Because of the physical isolation of the service station involved in this case, the injunction enlarged the distance in which picketing was prohibited.

Case No. 17010 was instituted in Morgan County and again a preliminary injunction was issued prohibiting C.O.A.L., its officers, members

and agents, from engaging in a course of conduct which interfered with the plaintiffs' ability to enter into business relationship with retail customers of petroleum products.

From all of these orders directing the issuance of preliminary injunctions, the defendant, C.O.A.L., has taken an interlocutory appeal pursuant to Supreme Court Rule 307 (Ill. Rev. Stat. 1979, ch. 110A, par. 307).

■■ C.O.A.L. (which term encompasses and includes all defendants-appellants) has raised several issues in this appeal, the first of which is their argument that its membership was engaged in public issue picketing, public assembly, and freedom of speech and press, all sacred freedoms protected by our Federal and State constitutions. We quarrel not with the assertion of C.O.A.L. that there are a myriad of cases that equate picketing with free speech and hence is protected by the first amendment of our Federal constitution. This court recognizes that picketing is a form of communication, yet it is not that form of communication which is dogmatically equated with constitutionally protected speech. (*Board of Education v. Kankakee Federation of Teachers Local 886* (1970), 46 Ill. 2d 439, 264 N.E.2d 18.) Our United States Supreme Court, in a case strongly relied upon by C.O.A.L., made the following observation:

> "We are not to be understood to imply, however, that residential picketing is beyond the reach of uniform and nondiscriminatory regulation. For the right to communicate is not limitless. [Citations.] Even peaceful picketing may be prohibited when it interferes with the operation of vital governmental facilities * * * or when it is directed toward an illegal purpose, * * *." *Carey v. Brown* (1980), 447 U.S. 455, 470, 65 L. Ed. 2d 263, 275, 100 S. Ct. 2286, 2295.

When dealing with attempts by individuals to exercise their first amendment right to freedom of speech in the form of picketing, a court must take into consideration the purpose for which the picketing is being conducted to ascertain whether it is in furtherance of a lawful purpose and not contrary to some statute or public policy. See *Illinois Power Co. v. Latham* (1973), 15 Ill. App. 3d 156, 303 N.E.2d 448.

The parties to this appeal, like parties to most controversies before this court, are in almost total disagreement as to all aspects and facets of the case in question. The one notable exception is that there is no disagreement that the action of C.O.A.L. resulted in what is classified as a secondary boycott. The goal of C.O.A.L. is to prevail upon Shell to take what steps necessary to see to it that union labor from the Springfield area is employed to construct the mine at Elkhart which will be owned by Shell and which will sell millions of tons of coal to the city of Springfield. Being unable to persuade Shell to meet its demands, C.O.A.L. proceeded

to picket a number of independent businessmen engaged in the business of selling Shell products to the public. The plaintiff-businessmen are neutral parties dependent upon purchases by the public for the maintenance and survival of their business. The record supports the conclusion that it was the hope of the defendants, acting through the loosely structured organization herein referred to as C.O.A.L., that their secondary boycott "will get to Shell." Defendant DeLand's testimony in part was to the effect that the activity (boycott) will undoubtedly hurt the small businessmen, but Shell must be attacked in any way. It is obvious that the members of C.O.A.L. were willing to harm and if necessary to destroy the business of the plaintiffs if such was necessary to achieve their goal. The record further reflects that damage to the plaintiff-businessmen was substantial to the point of being destructive.

■■ It is the defendants' contention that secondary boycotts are constitutionally protected and may not be enjoined. The plaintiffs counter that secondary boycotts, even though free from violence, may be enjoined where the activity is directed at a neutral employer. We agree with the plaintiffs. In *Meadowmoor Dairies, Inc. v. Milk Wagon Drivers' Union of Chicago No. 753* (1939), 371 Ill. 377, 21 N.E.2d 308, *aff'd* (1941), 312 U.S. 287, 85 L. Ed. 836, 61 S. Ct. 552, a union had picketed stores which sold the plaintiff's dairy milk in order to force the dairy to change from using independent contractors to distribute milk. The dairy sold milk directly to self-employed drivers who sold to retail stores. The union's picketing of the retail stores interfered with the independent drivers' ability to distribute milk. The court enjoined this activity and made the following lengthy but informative observation:

> "At common law every man has full freedom in disposing of his own labor or capital and any one who maliciously invades that right by misrepresentation, fraud or coercion is liable, because such acts constitute unlawful competition. [Citations.] He has a right to free and open market in which to purchase materials to do business and any one who invades such right without lawful cause commits a legal wrong. [Citations.] He has a right to enter into lawful contracts and any one who maliciously interferes by inducing such contracts to be broken, or by doing things which make them impossible of performance, is likewise liable. [Citations.] It is likewise illegal to persuade or coerce persons dealing with one in business into discontinuing such dealings by threats of injury to such customers by means commonly called a secondary boycott. [Citations.] These rights constitute property, and access to one's place of business or the enjoyment of the good will attending it are incidents of property." 371 Ill. 377, 381-82, 21 N.E.2d 308, 311.

The case of *Meadowmoor* does not stand alone. Without indulging in

an exhaustive analyzation, this court notes the cases of *Dinoffria v. Teamsters Local 179* (1947), 331 Ill. App. 129, 72 N.E.2d 635; *Twin City Barge & Towing Co. v. Licensed Tugmen's & Pilots' Protective Association* (1964), 48 Ill. App. 2d 1, 197 N.E.2d 749; *American Radio Association v. Mobile Steamship Association* (1974), 419 U.S. 215, 42 L. Ed. 2d 399, 95 S. Ct. 409; *National Labor Relations Board v. Retail Store Employees Local 1001* (1980), 447 U.S. 607, 65 L. Ed. 2d 377, 100 S. Ct. 2372; and *Teamsters Local 695 v. Vogt, Inc.* (1957), 354 U.S. 284, 1 L. Ed. 2d 1347, 77 S. Ct. 1166. In *Vogt*, the United States Supreme Court departs from the reasoning and results found in cases relied upon by the defendants, to-wit, *American Federation of Labor v. Swing* (1941), 312 U.S. 321, 85 L. Ed. 855, 61 S. Ct. 568, and *Thornhill v. Alabama* (1940), 310 U.S. 88, 84 L. Ed. 1093, 60 S. Ct. 736. After recognizing the cases of *Thornhill* and *Swing* and the principles applied therein, the court in *Vogt* stated as follows:

"Soon, however, the Court came to realize that the broad pronouncements, but not the specific holding, of Thornhill had to yield 'to the impact of facts unforeseen,' or at least not sufficiently appreciated. [Citations.] Cases reached the Court in which a State had designed a remedy to meet a specific situation or to accomplish a particular social policy. These cases made manifest that picketing, even though 'peaceful,' involved more than just communication of ideas and could not be immune from all state regulation. 'Picketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated.' [Citations.]

These latter two cases required the Court to review a choice made by two States between the competing interests of unions, employers, their employees, and the public at large. In the Ritter Cafe case, Texas had enjoined as a violation of its antitrust law picketing of a restaurant by unions to bring pressure on its owner with respect to the use of nonunion labor by a contractor of the restaurant owner in the construction of a building having nothing to do with the restaurant. The Court held that Texas could, consistent with the Fourteenth Amendment, insulate from the dispute a neutral establishment that industrially had no connection with it. This type of picketing certainly involved little, if any, 'communication.'" 354 U.S. 284, 289-90, 1 L. Ed. 2d 1347, 1351, 77 S. Ct. 1166, 1169.

In *Vogt*, the court recognized that there is a broad field in which a State in enforcing some public policy, whether of its criminal or civil law, and whether announced by its legislature or its courts, could constitution-

ally enjoin peaceful picketing aimed at preventing effectuation of that policy. The defendants in the instant case argue that a secondary boycott is not a violation of any law. However, a secondary boycott does violate a well-established public policy of our State. We refer to the policy which recognizes that a person's business is considered "property" and is entitled to protection from harm, and an action in tort will lie for interference with a business expectancy upon a showing (1) that there exists a valid business relationship or expectancy, (2) of knowledge by the tortfeasor of that business relationship or expectancy, (3) of an intentional interference on the part of the tortfeasor inducing or causing the termination of the business relationship or expectancy, and (4) of resultant damage to the party whose relationship or expectancy has been disrupted. (*City of Rock Falls v. Chicago Title & Trust Co.* (1973), 13 Ill. App. 3d 359, 300 N.E.2d 331.) No useful purpose would be served by a reiteration of the facts that resulted in this appeal. An examination of the same clearly discloses that all four conditions set forth in the case of the *City of Rock Falls* are present in the instant case. In granting the plaintiffs' requests for preliminary injunctions, the trial court concluded that the plaintiffs had made a requisite showing of the likelihood of succeeding on the merits of the case in that the defendants had tortiously interfered with business interests or expectancies.

■■■ The defendants further question whether the plaintiffs alleged and proved legally sufficient grounds for the issuance of the preliminary injunctions. The standards to be met for the issuance of a preliminary injunction are that the plaintiff show (1) that a certain and clearly ascertainable right needs protection, (2) that a likelihood of the plaintiff achieving success on the merits exists, (3) that irreparable injury will ensue without the protection of injunctive relief; and (4) that the remedy at law is inadequate. (See *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1978), 62 Ill. App. 3d 671, 379 N.E.2d 1228.) In the instant case the standards set forth in the case of *ABC Trans National* were met. The plaintiffs possessed a property right in their businesses that needed protection. As the result of the defendants' picketing, irreparable and substantial damage was being inflicted upon the plaintiffs by the loss of customers, loss of potential customers, and loss of good will, which in total amounted to loss of revenue or income to a degree that placed the businesses in a financially hazardous position. Because of the uncertainty as to damages and loss of good will, the extraordinary relief in the form of a preliminary injunction was warranted. (See *Hutter v. Lake View Trust & Savings Bank* (1977), 54 Ill. App. 3d 653, 370 N.E.2d 47.) It should further be noted that C.O.A.L. is admittedly a loosely structured organization, being unincorporated, having no by-laws, officers or directors, and hence an action seeking money damages against it was not possible.

(See *Technical Engineers Local 144 v. La Jeunesse* (1976), 63 Ill. 2d 263, 347 N.E.2d 712.) The plaintiffs in the instant case had no option as to the type of legal action to be pursued. Their only recourse was to seek injunctive relief.

■■ Lastly, the defendants claim that the injunctions issued are unconstitutionally and unequitably vague and broad. We fail to find in the record that the defendants at any time voiced an objection to the form of the injunctional orders issued by the trial courts involved in the instant case. Having chosen to remain mute, thereby denying the trial court an opportunity to correct any error, if there was one, the defendants cannot for the first time on appeal voice their objection. See *Kobrand Corp. v. Foremost Sales Promotions, Inc.* (1972), 8 Ill. App. 3d 418, 291 N.E.2d 61.

We will make one exception to our determination that the defendants have waived any objections to the form of the injunctive orders by deleting paragraph three of the preliminary injunction order in case No. 17010, since it is patently clear that said paragraph is overly broad in that there is no limitation as to area where the defendants are prohibited from picketing or distributing leaflets. This is in direct conflict with paragraphs one and two of said order and hence is an obvious and an inadvertent error. We make the deletion of only paragraph three of the order pursuant to the power granted this court by Supreme Court Rule 366(a)(1) (Ill. Rev. Stat. 1979, ch. 110A, par. 366(a)(1)). See also 32 Chi.-Kent L. Rev. 180 (1954).

For the reasons set forth, the judgments of the trial courts in cases Nos. 17010, 17042, 17043, and 17035, which directed the issuance of preliminary injunctions, are affirmed.

Affirmed.

ALLOY and HEIPLE, JJ., concur.